[No. A060619. First Dist., Div. Two. June 15 1995.]

STEVE MUNKDALE et al., Plaintiffs and Appellants, v.
ROLAND GIANNINI, as County Assessor, etc., et al., Defendants and
Respondents.

**COUNSEL**

Bowles & Verna, Ricahrd T. Bowles and Thomas G. F. Del Beccaro for Plaintiffs and Appellants.

Thomas F. Casey III, County Counsel, and Peter K. Finck, Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**PHELAN, J.**—Appellants Steve and Sharon Munkdale seek review of a judgment by which the San Mateo Superior Court denied their claim for a refund of property taxes paid. The trial court found that the respondents, County of San Mateo and its assessor, Roland Giannini, had properly reassessed 100 percent of certain parcels of real estate upon transfer of those

properties from a partnership of which appellants were partners, to appellants as individuals, pursuant to Revenue and Taxation Code section 61, subdivision (i).[1]

On appeal, the Munkdales contend that the conveyances did not involve a transfer of "beneficial use" and, thus, did not constitute a "change in ownership" of the properties within the meaning of the California Constitution, article XIII A, section 1, subdivision (a) (Proposition 13), and Revenue and Taxation Code section 60 et seq. They also raise an equal protection challenge to the reassessment, contending that the Legislature acted arbitrarily and unreasonably in affording the same tax treatment to transfers between corporations and former shareholders as is afforded transfers between partnerships and former partners. Assuming that there was a "change in ownership" and no constitutional violation, appellants argue in the alternative that, under the "step transaction doctrine," the transferred property should have only been reassessed 50 percent, not 100 percent. We reject each of these contentions and, accordingly, affirm the judgment of the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties stipulated to the material facts of this case, as follows: in approximately 1966, Munkdale Bros., a general partnership, was formed with Steve Munkdale and his brother Paul as equal partners in the enterprise.[2] At all relevant times prior to the transfers at issue in this appeal, Munkdale Bros. held title to 11 parcels of real estate in San Mateo County. For personal reasons, the brothers agreed in December 1988 to dissolve the partnership and to divide the holdings between them equally.

On January 9, 1989, pursuant to the agreement of the partners, five parcels were deeded to Steve and Sharon Munkdale, and five others to Paul and Mary Munkdale. The remaining parcel, located at 75 South Magnolia, Millbrae, California, was transferred to Steve and Paul Munkdale as tenants in common. Pursuant to section 61, subdivision (i), respondents reassessed 100 percent of each of the parcels conveyed to appellants as individuals upon recordation of title in appellants' names.[3]

Appellants appealed the new assessed value on the 1988 supplemental roll and the 1989 annual roll, claiming that since as a partner Steve Munkdale

---

[1] All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[2] The parties stipulated that the partnership interests were held as community property by Steve and Paul Munkdale and their respective wives. After the transfers, the properties deeded to appellants were held as community property.

[3] The 75 South Magnolia property, which was conveyed to Steve and Paul Munkdale as tenants in common, was not reassessed.

owned 50 percent of the property before the transfer, there could only have been a 50 percent transfer at the time of dissolution. The appeal was heard on June 8, 1990, by the assessment appeals board, which issued its written decision on September 21, 1990, denying the appeal. There was and is no question of valuation of any of the properties.

On March 18, 1991, appellants filed a complaint for refund of property taxes, and for declaratory relief. The matter was heard in a trial de novo (§ 1605.5) on December 17, 1992, in less than eight hours; no statement of decision was requested. A memorandum of decision was filed on December 29, 1992, and judgment was entered on January 21, 1993, denying appellants the relief requested in their complaint. A timely notice of appeal was filed on February 1, 1993.

## II. DISCUSSION

The parties agree that the issues presented in this appeal are purely legal and, thus, subject to de novo review by this court. (See *Shuwa Investments Corp.* v. *County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1644 [2 Cal.Rptr.2d 783] (*Shuwa*).)

A. *The Transfers From the Partnership to the Individual General Partners Constituted a "Change in Ownership" Within the Meaning of Sections 60 and 61.*

◼ Appellants first contend that the transfers at issue in this case did not constitute a "change in ownership" within the meaning of Proposition 13 as implemented by sections 60 and 61. Section 60 defines a change in ownership as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." In relevant part, section 61 provides: "Except as otherwise provided in Section 62, change in ownership, as defined in Section 60, includes . . . [¶] . . . [¶] (i) The transfer of any interest in real property between a corporation, partnership, or other legal entity and a shareholder, partner, or any other person." We conclude that section 60 and section 61, subdivision (i), authorize the 100 percent reassessment of appellants' properties.

Recently, in *Pacific Southwest Realty Co.* v. *County of Los Angeles* (1991) 1 Cal.4th 155, 160-161 [2 Cal.Rptr.2d 536, 820 P.2d 1046], the California Supreme Court described the genesis of sections 60 and 61, as follows: "The essence of Proposition 13 is its provision that all real property in the state shall be taxed at an ad valorem rate not to exceed 1 percent of its full cash

value. (Cal. Const., art. XIII A, § 1, subd. (a).) 'The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under "full cash value" or, thereafter, the appraised value of real property when purchased [or] newly constructed, or [when] a change in ownership has occurred after the 1975 assessment.' (*Id.*, § 2, subd. (a).) The only possible adjustment relevant here is for inflation, and that increase may not exceed 2 percent per annum. (*Id.*, § 2, subd. (b).) [¶] Because Proposition 13 did not explicate the meaning of 'change in ownership' [citations], it fell to the Legislature to define the phrase, a task it has striven to perform during the 13 years since Proposition 13 was adopted by the electorate. The main effort to create consistent and uniform guidelines to implement Proposition 13's undefined 'change in ownership' provision was undertaken by a 35-member panel that included legislative and board staff, county assessors . . . , trade associations, and lawyers in the public and private sectors. The panel's work culminated in the Report of the Task Force on Property Tax Administration (hereafter task force report), which was submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979. [¶] As plaintiff notes, the task force recommendations resulted in the enactment of the Revenue and Taxation Code provisions now before us. The Legislature adopted some of the recommendations verbatim or with nonsubstantive technical revisions, and others with rather minor changes. The report's key change-in-ownership test was adopted verbatim and is now codified as section 60, quoted [above]. [¶] The task force report drafters stressed the need for uniformity and consistency in the application of section 60's general rule. They stated that they 'sought to distill the basic characteristics of a "change in ownership" and embody them in a single test [now section 60] which could be applied evenhandedly to distinguish between "changes" and "non-changes," both those which the Task Force could and those which it did not foresee. The Task Force was also anxious that the single test be sufficiently consistent with the normal understanding of "change in owner-ship" to withstand legal attack.' (Task force rep., *supra*, at p. 38.) [¶] The task force 'recommends that its general definition of change in ownership (proposed Section 60 Rev & Tax Code) should control *all* transfers, both foreseen and unforeseen. The Task Force also recommends the use of statutory "examples" to elaborate on common transactions. Lay assessors and taxpayers would otherwise have difficulty applying legal concepts such as "beneficial use" and "substantially equivalent." Thus, common types of transfers were identified and concrete rules for them were set forth in proposed Sections 61 and 62.' (Task force rep., *supra*, at p. 40.)"

As the trial court found, section 61, subdivision (i) clearly applies to the transfers in this case. There is no dispute that Munkdale Bros. was a partnership and the owner of a fee interest in the each of the subject

properties prior to the transfer of a fee interest to the former partners as individuals. The transfers, thus, fall within the statutory definition of a "change in ownership," unless otherwise excepted.[4] (*Ibid.*; and see *Zapara* v. *County of Orange* (1994) 26 Cal.App.4th 464, 467-468 [31 Cal.Rptr.2d 555].)

The only real question raised by appellants under the statute is whether the transfers in this case involved a transfer of "beneficial use" as required by section 60. We conclude that they did. Appellants' argument to the contrary is based on *Allen* v. *Sutter County Bd. of Equalization* (1983) 139 Cal.App.3d 887 [189 Cal.Rptr. 101], a case which is readily distinguishable. *Allen* involved a trust established in 1961 by conveyance of real estate from the trustors to their son, as trustee, for the benefit of the trustors' four minor grandchildren. As described by the Court of Appeal, the terms of the trust were as follows: "From 1961 the grandchildren enjoyed equal equitable interests in the property; they received payments of income, or income was accumulated for them, until age 21; they had a right to income payments after age 21; indeed, they had the right, through a parent or guardian, to demand their share of the principal at any time." (*Id.* at p. 890.) The transfer at issue in *Allen* occurred in 1978, when the youngest grandchild reached the age of 25. At that time, the trustee was required to and did convey legal title to the four beneficiaries by means of a grant deed, which named the four grandchildren as tenants in common. (*Id.* at p. 889.) The trial court ruled that there was no change of ownership based on its findings that the beneficiaries had " 'the complete and total use of that property for their own benefit, for the benefit of no one else,' from 1961." (*Id.* at p. 890.) The Court of Appeal affirmed, holding that, "In effect, the only real change in 1978 was in the name of the holder of legal title. The beneficial ownership remained the same." (*Ibid.*) The court reasoned as follows: "Beneficial use of the property was transferred to the beneficiaries at the *creation* of the trust, and remained there." (*Id.* at p. 892, italics in original, fn. omitted.)

That is not what happened in this case.[5] Here, the "beneficial use" of the partnership properties underwent a significant—indeed comprehensive—

---

[4]Appellants point to no applicable exceptions. Section 62, subdivision (a)(1), provides an exception if the transfer involves only a change in the method of holding title, but only if the proportional interests remain the same before and after the transfer. That is not what happened here. Before the transfer, Steve Munkdale had—at most—a 50 percent interest in the subject properties. After the transfer, he obtained a 100 percent interest.

[5]A closer analogy to *Allen* in the partnership context can be found in *Parkmerced Co.* v. *City and County of San Francisco* (1983) 149 Cal.App.3d 1091 [197 Cal.Rptr. 401]. In that case a general partnership, Parkmerced Company, was formed to acquire and operate a large residential complex known as Parkmerced. One of the general partners, Parkmerced Corporation, took legal title to the property as the nominee of the partnership. Parkmerced Corporation was wholly owned by one Helmsley. Later, Parkmerced Corporation merged

change upon transfer to appellants as the owners of the fee simple interest in those properties. Under California law, "A partner is coowner [*sic*] with the other partners of specific partnership property holding as a tenant in partnership." (Corp. Code, § 15025, subd. (1).) However, as Division One of this court explained in *Bartlome* v. *State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1240 [256 Cal.Rptr. 719] "[T]he restrictions placed on an individual partner's interest in partnership property by section 15025 are all encompassing. The section states that a partner has no right to possess specific partnership property for nonpartnership purposes without the consent of his fellow partners; it prohibits a partner from assigning or selling his interest in specific partnership property without the consent of his partners; it prohibits enforcement of a money judgment against specific partnership property in connection with the debt of an individual partner; it requires that the right to specific partnership property vests in surviving partners rather than in the estate of a deceased partner; and it states that specific partnership property is not the community property of any individual partner. Thus, *most of the normal incidents of ownership are held by the partnership as a group rather than the individual partners.*" (Italics added.)[6]

By contrast, when the partnership deeded the property to appellants they obtained the absolute—and exclusive—rights to possess, use, enjoy and dispose of the entire fee interest in the property without limitation or condition. (See *Drexler* v. *Washington Development Co.* (1916) 172 Cal. 758, 760-761 [159 P. 166].) We conclude that there was a transfer of "beneficial use" from the partnership to appellants when the subject properties were deeded to them in 1989.

■ Appellants also argue that they could have structured their transactions differently so as to limit the property tax consequences to a 50 percent

---

with another corporation that was wholly owned by Helmsley, Sierra Towers Corp., with the latter emerging from the merger transaction as the "survivor." As a result of the merger, Sierra Towers became vested with the assets of Parkmerced Corporation and, thus, became the record owner of Parkmerced. Subsequently, Sierra Towers Corporation executed and recorded a deed conveying the property to Parkmerced Company. (*Id.* at pp. 1095-1096.) The court held that there was no "change in ownership" because Parkmerced Corporation and Sierra Towers Corporations held no more than " 'the bare legal title' " to the property, which was ultimately conveyed to the partnership, whereas the partnership remained, at all times, the beneficial owner of the property. (*Id.* at p. 1096.)

[6]In all material respects, California Corporations Code section 15025 is identical to section 25 of the Uniform Partnership Act, a provision which has been described as follows: "Although stating that each partner is a co-owner of the partnership property, [§ 25 of the Uniform Partnership] Act systematically destroys the usual attributes of ownership . . . . Functionally, despite the literal language, *the partnership owns its property and the partners do not.* The Act would be better if it conceded this rather than accomplishing it by indirection." (*Employers Cas. Co.* v. *Employers Commercial Union* (5th Cir. 1980) 632 F.2d 1215, 1219-1220.) This description of ownership of partnership property was adopted by Division One of this court in *Bartlome* v. *State Farm Fire & Casualty Co., supra,* 208 Cal.App.3d at pages 1241-1242.

reassessment. They claim they could have set up a conveyance from the partnership to the partners as tenants in common, without triggering any reassessment—as they did with the 75 South Magnolia property. (See § 62, subd. (a)(2).) Then, they assert, they could have had one of the tenants in common convey his interest to the other, in a series of transactions that would have resulted in only a 50 percent reassessment of each of the subject properties. Appellants rely on dicta from *Shuwa, supra,* 1 Cal.App.4th 1635, as support for this argument. Appellants' reliance is misplaced.

In *Shuwa, supra,* the Atlantic Richfield Company (ARCO) and Bank of America (BofA) were equal general partners in Flower Street Limited (Flower Street), a California general partnership that owned an office complex in downtown Los Angeles known as ARCO Plaza. In 1986, ARCO and BofA decided to sell ARCO Plaza to Shuwa Investments Corp. (Shuwa) in a three-step transaction, as follows: (1) ARCO would sell its partnership interest in Flower Street to Shuwa; (2) BofA and Shuwa would liquidate Flower Street and receive their respective 50 percent undivided interests in ARCO Plaza; and (3) BofA would sell its 50 percent undivided interest in ARCO Plaza to Shuwa. (1 Cal.App.4th at p. 1641.) When the county reassessed ARCO Plaza 100 percent for property tax purposes, Shuwa paid the increased taxes and then unsuccessfully sued in superior court for a refund on the theory that only the last step constituted a "change in ownership," warranting only a 50 percent reassessment.

On appeal, Shuwa argued that the first step was not a "change in ownership" because no partner obtained a "majority ownership interest" in the partnership as a result of the transfer. (§ 64, subd. (a).) Shuwa further contended that the second step, transferring the property from the partnership to the individual partners as tenants in common, fell within an exception provided for partnership transfers in which there is merely a "change in the method of holding title." (§ 62, subd. (a)(2).) Shuwa conceded that the third step resulted in a "change in ownership" as defined in section 61, subdivision (e), but only to the extent of BofA's 50 percent interest in the property. (*Shuwa, supra,* 1 Cal.App.4th at pp. 1645-1646.) In dicta, the Second District suggested that a 50 percent reassessment would be warranted *if* the transaction could properly be broken down into its separate components for analysis, as Shuwa urged. (*Id.* at p. 1648.) However, the court ultimately rejected Shuwa's approach, holding instead that under each of the relevant tests for application of the "step transaction doctrine" (*id.* at pp. 1648-1653), the transactions in that case had to be "stepped together to reveal what actually occurred—the acquisition by Shuwa of 100 percent of the ARCO Plaza" (*id.* at p. 1650).

Under the "step transaction doctrine," as applied by the court in *Shuwa, supra,* 1 Cal.App.4th at pages 1648 to 1653, the hypothetical two-step

transfer procedure posited by the Munkdales would have produced the same tax outcome as the actual transactions if the two steps "were really component parts of a single transaction," the original intent and ultimate result of which were for the individual partners to "acquire *all* of the [transferred property] from the present owner, a partnership." (*Id.* at pp. 1650-1651, italics in original.) This is the so-called "end result test" for determining whether the step transaction doctrine applies. (*Ibid.*) Similarly, if "on a reasonable interpretation of objective facts the steps [were] so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series," or if after the first step there was a "binding commitment" to complete the remaining steps, the transactions would be "collapsed" or "stepped together" and viewed as a single transaction. (*Id.* at pp. 1651-1653.)

Based on the undisputed evidence in the record, we have no doubt that all of the foregoing tests would have been satisfied—and the "step transaction doctrine" applied—if the partners had used a two-step procedure to structure the 1989 transactions. All indications are that the partners in Munkdale Bros. intended to sever their business relationship completely and to go their separate ways as independent owners of a fee simple interest in each of the subject properties. A transitory, intermediate step to another form of joint ownership—tenancy in common—would have been nothing more than an artifice to avoid the clear dictates of the Revenue and Taxation Code.[7]

## B. *The Statutory Treatment of Partnership Transfers Is Neither Arbitrary Nor Unreasonable.*

Appellants also claim—apparently for the first time on appeal—that application of section 61, subdivision (i) to the transfers in this case violates their rights under the equal protection clause of the state Constitution. (Cal. Const., art. I, § 7, subd. (a).) In this regard, appellants argue that it is arbitrary and unreasonable to afford the similar tax treatment to real property transferred from a corporation to one of its shareholders and from a partnership to a general partner. (§§ 60, 61, subd. (i) & 64; see also Cal. Code Regs., tit. 18, former § 462, subd. (j)(1), (2) & (5).) They believe it would be more reasonable to treat the latter type of transfer the same as a transfer from a joint tenancy to one of the joint tenants, or from a tenancy in common to one of the tenants in common. (§§ 60, 61, subd. (e) & 65; see also Cal. Code Regs., tit. 18, former § 462, subd. (b)(1).) This is so, they assert, because—

---

[7]We need not, and do not, decide the tax consequences of the transfer of the 75 South Magnolia property to Steve and Paul Munkdale as tenants in common, or any future disposition of that parcel. That transaction was structured differently for a specific reason, i.e., to provide a stable residence for the Munkdales' mother, who lived in one of the units.

unlike corporate shareholders—individual partners, joint tenants, and tenants in common all enjoy full "beneficial use" of their respective types of jointly held property. We reject this argument.

"In the field of taxation, the states enjoy wide 'latitude . . . in the classification of property . . . and the granting of partial or total exemptions upon grounds of policy.'" (*Nordlinger* v. *Lynch* (1990) 225 Cal.App.3d 1259, 1281 [275 Cal.Rptr. 684].) "So long as a system of taxation is supported by a rational basis, and is not palpably arbitrary, it will be upheld despite the absence of '"a precise, scientific uniformity"' of taxation." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 234 [149 Cal.Rptr. 239, 583 P.2d 1281).) Under this deferential standard, we conclude that the legislative scheme must be upheld.

Like corporations, partnerships are recognized in California law as separate legal entities with respect to property ownership. (*Bartlome* v. *State Farm Fire & Casualty Co.*, *supra*, 208 Cal.App.3d at pp. 1239-1240; Corp. Code, §§ 15008, 15025.) Neither joint tenancies nor tenancies in common are considered legal entities. (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership § 22, pp. 421-422.) As we have already discussed in section II, A, *ante,* this distinction gives rise to a qualitative difference in the "beneficial use" of corporate and partnership property by individual owners of the legal entity, as opposed to that enjoyed by individuals who share property as tenants in common or joint tenants. It is true, as appellants note, that joint tenants and tenants in common are equally entitled to share in the use and possession of the entire jointly held property. (See, e.g., *Donlon* v. *Donlon* (1957) 155 Cal.App.2d 362 [318 P.2d 189]; *Zaslow* v. *Kroenert* (1946) 29 Cal.2d 541, 548 [176 P.2d 1].) It is also true that shareholders enjoy severely limited rights with respect to corporate property. (See, e.g., *In re Mercantile Guaranty Co.*(1968) 263 Cal.App.2d 346 [69 Cal.Rptr. 361].) However, an individual partner's freedom to use and enjoy partnership property is also quite limited (*Bartlome* v. *State Farm Fire & Casualty Co.*, *supra*, 208 Cal.App.3d at pp. 1239-1240; Corp. Code, §§ 15008, 15025), and is, arguably, more like that of a corporate shareholder than that of a joint tenant or tenant in common. Thus, it is not irrational that the Legislature has chosen to differentiate between real property transfers from legally recognized entities such as corporations and partnerships, on the one hand, and nonentities such as joint tenancies and tenancies in common on this basis. Accordingly, appellants' equal protection claim must be rejected.

## III.  CONCLUSION

For all the foregoing reasons, we conclude that the appellants' properties were subject to 100 percent reassessment upon transfer from the partnership

and that, accordingly, the judgment of the trial court must be affirmed in its entirety. Costs to respondent.

Kline, P. J., and Haerle, J., concurred.