[No. D053411. Fourth Dist., Div. One. Aug. 17, 2009.]

FASHION VALLEY MALL, LLC, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO, Defendant and Respondent.

**COUNSEL**

Cahill, Davis & O'Neall, C. Stephen Davis, Cris K. O'Neall and Andrew W. Bodeau for Plaintiff and Appellant.

John J. Sansone, County Counsel, and Walter J. De Lorrell III, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**IRION, J.**—Fashion Valley Mall, LLC (Mallco), appeals from the trial court's summary judgment ruling in favor of the County of San Diego (the County) on Mallco's complaint for a refund of property taxes. At issue is the trial court's ruling that a 100 percent change in ownership occurred when record title in the Fashion Valley Shopping Mall in San Diego (the Mall) was transferred by Equitable Life Assurance Company of the United States (Equitable) to Mallco as Equitable's initial capital contribution to Mallco's parent company, Fashion Valley MM, LLC (FVM), which gave Equitable a 50 percent membership interest in FVM. Mallco contends that due to its membership interest in FVM, it retained 50 percent of the beneficial use of the Mall, and thus only a 50 percent change in ownership of the Mall occurred for purposes of property tax reassessment, rather than a 100 percent change in ownership as found by the trial court. As we will explain, we conclude that a 100 percent change in ownership of the Mall occurred, and accordingly we affirm.

I

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The Transaction*

In 2001, Equitable was the fee owner of 100 percent of the Mall when it entered into a transaction involving the transfer of its ownership of the real property (the Transaction). The issue in this appeal is whether, for property tax reassessment purposes, Equitable transferred all or only 50 percent of its ownership interest in the Mall.

The structure of the Transaction was as follows. Equitable and Simon Property Group, L.P. (Simon), created a Delaware limited liability company, FVM, to function as a holding company.[1] Simon and Equitable became equal

---

[1] "The limited liability company (LLC) is a relatively new, . . . hybrid form . . . of business entity . . . that combines the liability shield of a corporation with the federal tax classification of a partnership. . . . A creature of state law, each LLC is organized under an LLC statute that creates the company, gives it a legal existence separate from its owners (called 'members'), shields those members from partner-like vicarious liability, governs the company's operations, and controls how and when the company comes to an end. The essence of an LLC is the co-existence of partnership tax status with corporate-like limited liability." (Bishop & Kleinberger, Limited Liability Companies: Tax and Business Law (2009) ¶ 1.01[1], fns. omitted.)

members in FVM, with each of them holding a 50 percent interest.[2] Simultaneously, a wholly owned subsidiary of FVM was formed— Mallco—as the operating company for FVM, with the role of holding title to the Mall and acting as the management, leasing and development agent for it. As each of their initial capital contributions to FVM, Equitable contributed the Mall, and Simon contributed $165 million.

As part of the Transaction, the parties used a grant deed recorded in the San Diego County Recorder's office to transfer record title in the Mall directly from Equitable to Mallco. A "Contribution Agreement" entered into by Equitable, Simon, FVM and Mallco detailed an off-record chain of title in which the grant deed transferring the Mall directly to Mallco from Equitable would "be deemed to be a contribution by Equitable of the Mall to [FVM], and the contribution of the Mall by [FVM] to Mallco," resulting in FVM "hold[ing] title to the Mall in Mallco." At closing, FVM was to make a special, one-time distribution to Equitable, equivalent to Simon's initial $165 million capital contribution to FVM, and Simon was designated as the managing member of FVM.

B. *Reassessment of the Mall*

In August 2002 the San Diego County Assessor determined that the Transaction resulted in a 100 percent change in ownership of the Mall. It therefore reassessed the Mall pursuant to Revenue and Taxation Code section 75.10,[3] increasing the assessed value of the Mall for property tax purposes from approximately $247 million to $360 million. Mallco filed an appeal of the assessor's decision with the San Diego County Assessment Appeals Board (the AAB).

C. *The Reformation Agreement*

While Mallco's appeal of the assessor's decision was pending before the AAB, Equitable, Simon, FVM and Mallco entered into a June 2004 agreement entitled "Agreement to Rescind, Restructure and Reform the Contribution Agreement Dated September 28, 2001" (the Reformation Agreement).[4] The

---

[2] The terms of the Transaction were reflected in the limited liability company agreement governing FVM (the FVM LLC Agreement).

[3] Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

[4] Simon consulted with the State Board of Equalization (SBE) before entering into the Reformation Agreement. Several months later, an SBE staff attorney issued an opinion letter stating that if the Transaction was carried out based on the Reformation Agreement, as it was described to the SBE by Simon, only a 50 percent change in ownership would occur for the purpose of the property tax laws. Because the SBE staff attorney did not review the Reformation Agreement in assuming that the Transaction had been reformed, we accord little

Reformation Agreement provided that it was intended to "expressly document[] a change in ownership *of only fifty percent (50%) of the Mall*, by providing that Equitable transfer one-half of its ownership interest in the Mall to [Simon] in exchange for [Simon's] [i]nitial [c]apital [c]ontribution and thereafter requiring both Equitable and [Simon] to transfer their respective one-half ownership interests in the Mall to [FVM]." (Italics added.)

The Reformation Agreement sought to effectuate a transfer of only 50 percent ownership of the Mall by providing that "[f]or property tax purposes only" certain provisions in the Contribution Agreement describing the Transaction were "rescinded, reformed, restructured, superseded and replaced" in favor of provisions stating that upon closing of the deal described in the Contribution Agreement the following shall occur: (1) Equitable shall transfer an undivided 50 percent interest in the Mall to Simon; (2) as consideration, Simon shall transfer its initial contribution in FVM to Equitable; (3) Equitable shall transfer to FVM "as a capital contribution" its remaining undivided 50 percent interest in the Mall; (4) Simon shall transfer to FVM "as a capital contribution" the 50 percent interest in the Mall that it received from Equitable; and (5) Equitable shall deed the Mall to Mallco. The Reformation Agreement further provided that the grant deed transferring the Mall directly from Equitable to Mallco "shall be deemed to be a contribution by Equitable and Simon of their respective interests in the Mall to [FVM], and the [c]ontribution of the Mall by [FVM] to Mallco."

Emphasizing that the parties intended the prior version of the Contribution Agreement to remain in effect for all purposes *except for the assessment of property taxes*, the Reformation Agreement provided that it "shall be operative, and is to be given effect, . . . *solely for property tax purposes*. In all other respects, the Contribution Agreement, and the structure of the transaction described in the Contribution Agreement, shall remain in full force and effect for all other purposes, including without limitation income tax and securities purposes and commercial and real estate activities." (Italics added.)

D.  *The Ruling of the Assessment Appeals Board*

In its appeal to the AAB, Mallco relied on the Reformation Agreement to argue that only a 50 percent change in ownership in the Mall had occurred.[5]

---

weight to the opinion letter. (See *Shuwa Investments Corp. v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1651, fn. 16 [2 Cal.Rptr.2d 783] (*Shuwa*) [court accorded less weight to an SBE opinion letter when it made a "number of assumptions on critical matters"].)

[5] If a 50 percent ownership change occurred, only 50 percent of the Mall would be reassessed for property tax purposes. (§ 65.1, subd. (a) [stating that, with certain exceptions, "when an interest in a portion of real property is purchased or changes ownership, only the interest or portion transferred shall be reappraised"].)

The AAB ruled against Mallco, concluding that a 100 percent ownership change occurred, and that the Reformation Agreement was not effective to change the property tax effects of the Transaction in that it did not actually rescind the Transaction but instead purported to reform it "solely for property tax purposes," while otherwise maintaining the status quo.

E. *Mallco Files This Litigation and the Parties File Cross-motions for Summary Judgment*

Mallco then filed an action for refund of property taxes against the County in the superior court pursuant to section 5140, seeking a ruling setting aside the assessor's reassessment of the Mall.

The parties submitted cross-motions for summary judgment based on the stipulated facts and exhibits contained in the administrative record of the proceeding before the AAB. The trial court ruled in favor of the County, holding that "the Final Decision of the [AAB] upholding the County Assessor's 100% change in ownership determination was correct."

Mallco appeals from the judgment.

## II

## DISCUSSION

A. *Standard of Review*

The issue of whether, based on a set of undisputed facts, there has been a change in ownership for purposes of property tax assessment "is a question of law subject to this court's independent de novo judicial review." (*Shuwa, supra,* 1 Cal.App.4th at p. 1644.) We thus apply a de novo standard of review in considering Mallco's appeal of the trial court's ruling.

B. *Applicable Law*

Article XIII A of the California Constitution (Proposition 13)[6] provides that real property shall be reassessed for property tax purposes when a "change in ownership" occurs or the property is "newly constructed" or "purchased." (Cal. Const., art. XIII A, § 2, subd. (a).) Because the meaning of "change of ownership" as used in Proposition 13 was not defined, the

---

[6] "California Constitution, article XIII A is commonly known as 'Proposition 13,' its ballot designation when passed as an initiative constitutional amendment in 1978." (*Zapara v. County of Orange* (1994) 26 Cal.App.4th 464, 467, fn. 2 [31 Cal.Rptr.2d 555].)

Legislature enacted various provisions defining that term.[7] (§§ 60–66; *Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 161 [45 Cal.Rptr.3d 774, 137 P.3d 951] (*Auerbach*).) "[S]ection 60 . . . contains the basic change-in-ownership test; section 61 . . . contains examples of what *is* a change in ownership; and section 62 . . . contains examples of what is *not* a change in ownership." (*Auerbach*, at p. 161.)

■ "[T]he Legislature intended for section 60 to contain the overarching definition of a 'change in ownership' for reassessment purposes." (*Pacific Southwest, supra*, 1 Cal.4th at p. 162.) Section 60 states: "A 'change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Thus, as our Supreme Court has explained, the test set forth in section 60 " 'contains three parts: "A 'change in ownership' means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is substantially equal to the value of the fee interest." ' " (*Auerbach, supra*, 39 Cal.4th at p. 161.)

Sections 61 and 62, which set forth examples of what is and is not a change in ownership, were intended "to elaborate on common transactions" because "[l]ay assessors and taxpayers would otherwise have difficulty applying [the] legal concepts" contained in section 60's definition. (*Pacific Southwest, supra*, 1 Cal.4th at p. 161.) Thus, " 'common types of transfers were identified and concrete rules for them were set forth in proposed Sections 61 and 62.' " (*Ibid.*)

■ Section 61, subdivision (j) applies here because it establishes that the transfer of real property from a corporation (such as Equitable) to a limited liability company (such as FVM) is a change in ownership. Specifically, section 61, subdivision (j) provides that "[t]he transfer of any interest in real property between a corporation, partnership, or other legal entity and a shareholder, partner, or any other person" constitutes a change in ownership. "Person" as defined in the Revenue and Taxation Code—and as used in section 61, subdivision (j)—includes a limited liability company and thus encompasses FVM. (§ 19.)

Another provision relevant to this litigation is section 62, subdivision (a)(2). Under that provision, with certain exceptions, "[a]ny transfer

---

[7] The relevant statutes are the outgrowth of a report by a 35-member task force charged with drafting legislation to implement Proposition 13. (See *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 161 [2 Cal.Rptr.2d 536, 820 P.2d 1046] (*Pacific Southwest*).) The work of the task force culminated in a report (Task Force on Property Tax Admin., Rep. to Assem. Com. on Rev. & Tax. (Jan. 22, 1979); hereinafter Task Force Report) that is often cited as part of the legislative history of the relevant statutory provisions. (*Pacific Southwest*, at pp. 161–162.)

between an individual or individuals and a legal entity or between legal entities, such as a cotenancy to a partnership, a partnership to a corporation, or a trust to a cotenancy, that results solely in a change in the method of holding title to the real property *and in which proportional ownership interests* of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred, *remain the same after the transfer*." (*Ibid.*, italics added.) Mallco argued to the AAB that due to the Reformation Agreement, section 62, subdivision (a)(2) applied to the Transaction.[8]

## C. *The Reformation Agreement Does Not Apply*

Before we analyze whether the Transaction created a change in ownership for purposes of property tax reassessment, we must first determine which version of the Transaction is applicable—the version set forth in the original documentation or the version set forth in the Reformation Agreement. As we will explain, because the Reformation Agreement purports to apply "[f]or property tax purposes only," it is a sham transaction that is ineffective to change the terms of the Transaction for purposes of a property tax analysis.

Of central importance here, the Reformation Agreement provided that it "shall be operative, and is to be given effect, . . . solely for property tax purposes. In all other respects, the Contribution Agreement, and the structure of the transaction described in the Contribution Agreement, shall remain in full force and effect for all other purposes, including without limitation income tax and securities purposes and commercial and real estate activities." The Reformation Agreement expressly provided that the recorded grant deed would remain unchanged, and it made no provision for any changes to the FVM LLC Agreement, which continues to reflect the Transaction as originally entered into by the parties, including that Equitable would contribute 100 percent of the Mall to FVM as its initial capital contribution, and that Simon would contribute $165 million to FVM as its initial capital contribution.

Mallco has cited no authority, and we are aware of none, permitting a transaction to simultaneously exist in two different forms—i.e., "solely for property tax purposes" on the one hand, and for "income tax and securities

---

[8] As we understand Mallco's current position, it acknowledges that the Reformation Agreement was intended to trigger section 62, subdivision (a)(2), but it has not advanced that issue as the focus of its argument in the trial court or on appeal. Based on our conclusion, explained below, that the Reformation Agreement is not effective, we need not, and do not, decide whether the version of the Transaction as described in the Reformation Agreement falls under the situation described in section 62, subdivision (a)(2).

purposes and commercial and real estate activities" on the other hand.[9] Because the form of the Transaction as described in the Reformation Agreement purports to exist solely for the purpose of attempting to avoid a property tax reassessment, while the original form of the Transaction continues to exist for all other purposes—and is consistent with the Transaction as set forth in other documents, including the FVM LLC Agreement—the Transaction described in the Reformation Agreement is a mere fiction.

Analogous situations are discussed by federal courts under the "sham-in-fact" doctrine in the area of federal income taxation. Under that doctrine, "[s]hams in fact are transactions that never occur. In such shams, taxpayers claim deductions for transactions that have been created on paper but which never took place." (*Kirchman v. Commissioner* (11th Cir. 1989) 862 F.2d 1486, 1492 (*Kirchman*).) Under the sham-in-fact doctrine, "paper transactions which solely attempt to create deductible losses or expenses are not recognized." (*Dow Chem. Co. v. U.S.* (E.D.Mich. 2003) 250 F.Supp.2d 748, 811.) In deciding whether a transaction is a sham in fact, courts " 'will ignore accounting tricks and other transactional artifices' " and will "consider[] whether appropriate business formalities are employed, industry customs and practices are followed, and there is compliance with relevant commercial norms."[10] (*Dow Chem. Co.*, at p. 811.)

■ Here, as in other shams in fact, the Reformation Agreement is nothing more than a paper transaction and a transactional artifice that exists for the purpose of seeking to avoid tax liability. It has no economic substance other than to avoid tax liability, and is thus a legal fiction that cannot be given effect for the purposes of determining Mallco's property tax liability.[11] " ' "[A] transaction is to be given its tax effect in accord with what *actually*

---

[9] Mallco relies on a statement in *Auerbach* concerning a provision in a lease agreement identifying the party who "owned" a leased building. (*Auerbach, supra*, 39 Cal.4th at p. 162.) *Auerbach* stated, "[w]hatever this might mean for other purposes, this statement is not dispositive for purposes of section 60's change-of-ownership test . . . ." (*Ibid.*) This statement merely observes that the terms of a party's agreement may have different legal consequences in different legal contexts. It does *not* establish that two different structures of the same transaction may exist simultaneously for different purposes.

[10] Although we are not aware of any California courts having had occasion to address the sham-in-fact doctrine, that doctrine arises out of the same general judicially created federal antiavoidance doctrine as the "step transaction doctrine," which has been applied by California courts in property tax cases. (*McMillin-BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 550 [37 Cal.Rptr.2d 472]; *Shuwa, supra*, 1 Cal.App.4th at p. 1648.) Both the step transaction doctrine and the sham transaction doctrine (of which the sham-in-fact doctrine is a part) are based on the general principle developed in the area of federal income tax law that courts should look at the substance of a transaction rather than just its form. (*Shuwa*, at p. 1648; *Kirchman, supra*, 862 F.2d at p. 1491.)

[11] Although the County did not refer to the sham-in-fact doctrine in its briefing, its argument for giving no effect to the Reformation Agreement relies on an identical concept. The County

occurred and not in accord with what might have occurred." ' " (*Penner v. County of Santa Barbara* (1995) 37 Cal.App.4th 1672, 1679 [44 Cal.Rptr.2d 606], italics added, quoting *Don E. Williams Co. v. Commissioner* (1977) 429 U.S. 569, 579 [51 L.Ed.2d 48, 97 S.Ct. 850].) Because the parties did not reform the Transaction for all purposes, and did not amend all of the documents relevant to the Transaction, including the FVM LLC Agreement, what *actually* occurred is the Transaction as described in the original documents. Because the Reformation Agreement is a sham, we will not consider it when determining whether there was a change in ownership of the Mall for property tax purposes. " 'To hold otherwise would be to exalt artifice above reality' " (*Shuwa, supra,* 1 Cal.App.4th at p. 1650), which we refuse to do.

## D. *Equitable Did Not Retain a Beneficial Interest in the Mall*

We now turn to the issue of whether, based on the Transaction as originally structured, there was a 100 percent change in ownership, as the County contends, or only a 50 percent change in ownership, as Mallco contends.

### 1. *Beneficial Interest Must Transfer for a Change in Ownership to Occur*

As we have explained, section 61, subdivision (j) applies here. It states that a change in ownership occurs when there is a "transfer of any interest in real property between a corporation, partnership, or other legal entity and a shareholder, partner, or any other person." (*Ibid.*) Equitable—a New York corporation—transferred 100 percent of its fee interest in the Mall to FVM—a limited liability company classified as a "person" for the purposes of the statute (§ 19).[12] The County contends that, based on section 61, subdivision (j), we should conclude that the Transaction created a 100 percent change in ownership of the Mall.

---

contends that the Reformation Agreement "did nothing to change the nature of the transaction," and "[t]he parties cannot have the transaction exist one way for income tax, securities, commercial, and real estate purposes and another way for property tax purposes."

[12] As we have explained, although the grant deed recorded by Equitable transferred the Mall directly to Mallco, the Contribution Agreement detailed an off-record chain of title, under which Equitable first transferred the Mall to FVM, and FVM then transferred the Mall to Mallco. Section 64, subdivision (b) provides that a change of ownership does not occur upon the transfer of real property among members of an affiliated group. An " 'affiliated group' " is defined as, with certain conditions, "one or more chains of corporations connected through stock ownership with a common parent corporation." (*Ibid.*) Because FVM holds a 100 percent membership interest in Mallco, FVM and Mallco constitute an "affiliated group." The County has not contended that the off-record transfer between FVM and Mallco constitutes a change in ownership of the Mall. Accordingly, our focus is on whether the first step of the off-record chain of title (i.e., the transfer between Equitable and FVM) constitutes a change in ownership.

■ However, Mallco argues that in addition to applying section 61, subdivision (j), we also must look to the general definition of a change in ownership set forth in section 60. One of the three requirements for a change in ownership set forth in section 60 is a transfer of the *beneficial use* of an interest in real property. (*Auerbach, supra,* 39 Cal.4th at p. 161 [" ' "A 'change in ownership' means [1] a transfer of a present interest in real property, [2] *including the beneficial use thereof,* [3] the value of which is substantially equal to the value of the fee interest." ' " (italics added)].) "The second prong of section 60 requires that to constitute a change in ownership there must be a transfer not only of bare legal title but also of the transferor's *beneficial or equitable interest* in the land."[13] (*Pacific Southwest, supra,* 1 Cal.4th at p. 163.) Focusing on the concept of beneficial interest, Mallco argues that Equitable retained its beneficial interest in 50 percent of the Mall because it transferred the Mall to FVM, in which it holds a 50 percent membership interest. Mallco contends that due to its status as a member of FVM, "the full beneficial interest did not convey because Equitable always retained the right to receive one-half of the net income generated by the Mall; always bore one-half of the losses resulting from the operation of the Mall . . . ; was required to provide equally for the cash needs in respect of the Mall . . . ; retained its income tax basis in its retained 50% share of the Mall . . . ; and retained 50% percent control to direct the activities of [FVM]." (Fns. omitted.)

■ We agree that, despite the applicability of section 61, subdivision (j) to this case, we nevertheless should focus on whether there has been a transfer of a *beneficial interest* as set forth in section 60. As our Supreme Court has explained, "[a] factual analysis of section 60's factors is always necessary" because "[s]ection 60 provides the 'overarching definition' of a change in ownership," and "[t]he examples found in sections 61 and 62 must be interpreted in light of this definition." (*Auerbach, supra,* 39 Cal.4th at p. 165, fn. 4; see also *Pacific Southwest, supra,* 1 Cal.4th at p. 169 [result of analysis under § 60 took precedence over specific exception set forth in § 62].) Thus, in light of section 60, we interpret the phrase "[t]he transfer of *any interest in real property,*" as used in section 61, subdivision (j), to mean "a transfer of a present interest in real property, *including the beneficial use thereof,* the value of which is substantially equal to the value of the fee interest" as set forth in section 60. (Italics added.)

---

[13] As our Supreme Court does in *Pacific Southwest, supra,* 1 Cal.4th at page 163, we use the term "beneficial interest" as a shorthand way to refer to an interest in the beneficial use of real property.

### 2. *Mallco Contends That Equitable Retained Its Beneficial Interest in the Mall Due to Its Status as a Member of FVM*

■ The central question presented, therefore, is whether Equitable retained a 50 percent beneficial interest in the Mall due to its status as a member in FVM. Evidence Code section 662 creates a presumption that "[t]he owner of the legal title to property is presumed to be the owner of the full beneficial title," and states that "[t]his presumption may be rebutted only by clear and convincing proof." (*Ibid.*) Our Supreme Court has relied on this presumption in analyzing whether the beneficial use of a property transferred for property tax purposes. (*Pacific Southwest, supra,* 1 Cal.4th at p. 164; *Auerbach, supra,* 39 Cal.4th at pp. 158, 163.)

Mallco contends that it has rebutted the presumption set forth in Evidence Code section 662 by focusing on Equitable's status as a member of FVM, including its right to receive the income generated by the Mall and its right to exercise control over the Mall. Mallco points to several provisions in the FVM LLC Agreement showing that, as a member of FVM, Equitable has a certain amount of control over the Mall, including participation in any decision to sell or encumber the Mall.[14] Mallco also relies on provisions in the FVM LLC Agreement that it contends provides Equitable with 50 percent of the economic benefits from the Mall.[15] Mallco draws the conclusion, which it wishes us to adopt, that because Equitable, as a member of FVM, is allocated 50 percent of the income or losses generated by the Mall and exercises some degree of control over the Mall, Equitable has a 50 percent beneficial interest in the Mall.

---

[14] Mallco relies on two provisions of the FVM LLC Agreement to establish that Equitable, as a member of FVM, retained some degree of control over the Mall. First, paragraph 5 provides that "[t]he purpose of [FVM] is to own and hold one hundred percent (100%) of the membership interest in Mallco and, *at the direction of the Members,* to execute on behalf of Mallco deeds, leases, mortgages and other instruments and documents which relate to the [Mall] . . . . [FVM] shall not engage in any other activities without the consent of both of the Members." (Italics added.) Second, paragraph 15.4.6 provides that although Simon—not Equitable—is the managing member of the FVM, the prior approval of Equitable is necessary for certain items, including the sale or mortgaging of the Mall.

[15] Mallco relies on several provisions of the FVM LLC Agreement for its contention that it received 50 percent of the economic benefits from the Mall. The FVM LLC Agreement provides that "[e]ach Member shall initially have a Percentage Interest in [FVM] of 50%." Second, Simon and Equitable are to provide for the cash needs of FVM in proportion to their respective membership interests. Third, FVM's net income or net loss is to be allocated to Simon and Equitable in proportion to their membership interests. We note, however, that the allocation of net income and net loss is not actually equal because Simon receives an annual priority distribution ranging in an amount from $250,000 to $1,125,000, depending on the year.

### 3. *Mallco Improperly Focuses on Whether Equitable Obtained the Ultimate Economic Benefit from the Mall*

At the heart of Mallco's argument is its broad definition of beneficial interest. Mallco contends: "Whether a taxpayer has retained a beneficial interest in property requires consideration of the *ultimate economic benefit*." According to Mallco, "the beneficial interest is determined by looking to the right to receive income generated from the property, or otherwise retain an economic interest in the property." Mallco argues that applying the "ultimate economic benefit test," Equitable retains a beneficial interest in the Mall, because, as a member of FVM, it purportedly obtains half of the income generated by the Mall. As we will explain, we reject Mallco's argument because the "ultimate economic benefit" test is overly broad and finds no support in case law or the legislative history.

We begin with statements in the legislative history about the separate requirement in section 60 that, for a change in ownership in real property to occur, a transfer of beneficial interest must take place. According to the Task Force Report, the concept of "[b]eneficial use" in the definition of a "change in ownership" was meant "to protect custodianships, guardianships, trustee-ships, security interests, and other fiduciary relationships from unintended change in ownership treatment." (Task Force Report, *supra*, at p. 39.) The Task Force Report offered the example of a father who buys land for his minor son, "taking title as custodian for the son." (*Ibid.*) It explained that "when the son reaches majority and gets the property outright there is no change in ownership" because "[t]he son was the real owner from the outset and when he reached majority there was no transfer of the beneficial use." (*Ibid.*) In such a situation, "bare legal title" will have transferred, but the "beneficial interest" in the property will stay with the same person. (See *Pacific Southwest, supra*, 1 Cal.4th at p. 163 [distinguishing between transfer of "bare legal title" and "beneficial or equitable interest in the land"].)

Case law provides only limited clarification of the meaning of "beneficial use" as it appears in section 60. The most pertinent discussion appears in *Pacific Southwest, supra*, 1 Cal.4th 155. There, our Supreme Court addressed whether the beneficial use of property transferred to the buyer in the situation of a sale and leaseback of real property. In *Pacific Southwest*, the owner of a commercial property sold the property to the buyer but retained an interest in the real property in the form of a lease covering a portion of the property. (*Id.* at pp. 163–164.) The seller contended that beneficial use had not transferred due to its exclusive use of the portion of the real property covered by the lease. (*Id.* at p. 163.) Explaining that there was "*no evidence showing*

*a custodial or trust relationship"* between the buyer and the seller, our Supreme Court concluded that the buyer of the property had acquired beneficial use of the property, despite the leaseback to the seller. (*Id.* at p. 164.) Thus, consistent with discussion in the Task Force Report, *Pacific Southwest* analyzed whether beneficial use was held by two different parties by focusing on whether a *fiduciary situation existed*, in which one party holds title *for the benefit of another*. It did not focus on the concept of the ultimate economic benefit.

In support of its proposed "ultimate economic benefit" test, Mallco relies on two cases. First, Mallco cites *Pacific Southwest, supra*, 1 Cal.4th 155, which, as we have explained, does not support Mallco's argument. Second, Mallco relies on *Reilly v. City and County of San Francisco* (2006) 142 Cal.App.4th 480 [48 Cal.Rptr.3d 291]. In *Reilly*, a trust held title to real property, with the income from the property going to the trust's income beneficiary. (*Id.* at pp. 485–486.) *Reilly* concluded that "[t]he receipt of income generated by property qualifies as a 'beneficial use' of the property . . . ," even though the income beneficiary did not have the right to occupy the property. (*Id.* at p. 495.) Although *Reilly* concerned a trust beneficiary's receipt of income from a property, it does not support the broad proposition, advanced by Mallco, that a party holds a beneficial interest in a property, within the meaning of section 60, *whenever* it ultimately obtains an economic benefit from the property. Instead, *Reilly* is consistent with the principle expressed by the Task Force Report and *Pacific Southwest* that beneficial use and bare legal title may be split in a fiduciary situation, such as that presented by a trust holding title for the beneficiary of the trust.

■ Mallco has identified no case law outside of the context of a fiduciary situation—and we are aware of none—in which one party was found to enjoy beneficial use for the purposes of section 60, while another party held legal title.[16] Accordingly, we reject the broad ultimate economic benefit test that Mallco proposes, and we instead follow the principle developed in *Pacific Southwest* and the Task Force Report that a party will hold an interest in the beneficial use of real property while another party holds legal title only in

---

[16] Mallco also cites *Parkmerced Co. v. City and County of San Francisco* (1983) 149 Cal.App.3d 1091 [197 Cal.Rptr. 401]. In *Parkmerced*, a corporation, which was also a partner in a partnership, held title to real estate "as nominee of, and as authorized by, the partnership." (*Id.* at p. 1095.) *Parkmerced* concluded that because the corporation held title as a *nominee*, it "held no more than the 'bare legal title' " to the real estate, with the partnership enjoying the beneficial use of it. (*Id.* at p. 1096.) Although *Parkmerced* did not elaborate on the nature of the corporation's role as a nominee, a "nominee" is generally defined as, among other things, "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." (Black's Law Dict. (8th ed. 2004) p. 1076, col. 1.) Applying this definition, it appears that the corporation was acting as a custodian or fiduciary of the real property on behalf of the partnership.

fiduciary situations, such as custodianships, guardianships, trusteeships and security interests. As no such fiduciary situation exists in this case, we conclude that the entity that holds the beneficial interest in the Mall is the same entity that holds legal title to the Mall, namely, Mallco. Accordingly, there is no merit to Mallco's contention that Equitable retains a beneficial interest in the Mall due to the fact that it ultimately receives an economic benefit from the Mall as a member of FVM.[17]

### 4. Equitable Does Not Hold a Beneficial Interest in the Mall Due to Its Ability to Exercise Some Degree of Control Over the Mall as a Member of FVM

Mallco also argues that because, as a member of FVM, Equitable exercises some degree of control over Mall, it retains a beneficial interest in the Mall. We reject this argument because it is FVM, through its operating company Mallco, that exercises control over the Mall, not Equitable.

■ Significantly, a member in a limited liability company does not hold any interest in the real property owned by the limited liability company. "A member has no interest in specific limited liability company property." (Del. Code Ann., tit. 6, § 18-701; see also Corp. Code, § 17300 ["A member or assignee has no interest in specific limited liability company property."].)[18] Instead, a member possesses a personal property interest in its limited liability company membership interest. (Del. Code Ann., tit. 6, § 18-701 ["A limited liability company interest is personal property"; Corp. Code, § 17300 ["A membership interest and an economic interest in a limited liability company constitute personal property of the member or assignee."].)[19] Thus, under the FVM LLC Agreement, Equitable had the right to receive distributions from FVM if the company made a profit, and it had the right to participate in certain management decisions, including decisions about whether to sell or encumber the Mall. But those benefits and rights derived from the personal property interest that Equitable had in its membership interest in FVM; they did not derive from any beneficial interest in the real property.

---

[17] As part of its argument that Equitable receives an ultimate economic benefit from the Mall, Mallco argues that "Equitable retained its income tax basis in its retained 50% share of the Mall." Mallco does not develop this argument, and we express no view on whether Mallco has correctly described the income tax impacts of the Transaction. We need not further consider Mallco's argument because it depends on Mallco's proposed "ultimate economic benefit" test, which we have rejected.

[18] FVM is a Delaware limited liability company and, thus, governed by Delaware law. As noted above, however, Delaware and California law are the same on this critical point.

[19] Consistent with this principle, the FVM LLC Agreement provides that "[t]he interest of each of the Members in [FVM] constitutes personal property."

*Munkdale v. Giannini* (1995) 35 Cal.App.4th 1104 [41 Cal.Rptr.2d 805] (*Munkdale*) addressed a similar issue in the context of a partnership. In *Munkdale*, a partnership owned several parcels of real property. The issue there was whether the partners enjoyed beneficial use of the real property, as set forth in section 60, by virtue of their status as partners of the partnership.[20] *Munkdale* examined the legal nature of the interest held by a partner in a partnership, including the significant limitations on a partner's use of the property for his or her own purposes, and concluded that a partner does not enjoy beneficial use of the real property held by the partnership. As *Munkdale* explained, " 'most of the normal incidents of ownership are held by the partnership as a group rather than the individual partners.' " (*Munkdale, supra*, 35 Cal.App.4th at p. 1111, italics omitted.)

The same analysis applies in the case of limited liability companies, such as FVM and Mallco. As the FVM LLC Agreement makes clear, there are numerous restrictions on Equitable's ability to make use of the Mall. The Mall is owned and managed by FVM, through its operating company Mallco. Equitable's right to make decisions about the Mall is limited by the terms of the FVM LLC Agreement, under which Simon, not Equitable, is the managing member. Although Mallco points to provisions in the FVM LLC Agreement that require Equitable's approval before certain decisions are made about the Mall, such as selling it or encumbering it, the decisions on those topics are made by FVM, with Equitable participating in the decisions as a member, according to the terms of the FVM LLC Agreement.[21] Thus, similar to the result in *Munkdale*, because of the restrictions inherent in its status as a member of FVM, Equitable does not hold a beneficial interest in the Mall.

For these reasons, we conclude that Equitable did not, due to its status as a member of FVM, retain a beneficial interest in the Mall. Accordingly, the trial court properly concluded that a 100 percent change in ownership occurred as a result of the Transaction.

---

[20] The issue of beneficial use arose in *Munkdale* because certain parcels of real property were transferred to one or other of the partners upon dissolution of the partnership, causing a reassessment for property tax purposes. (*Munkdale, supra*, 35 Cal.App.4th at p. 1107.) The partners argued that beneficial use had not transferred, and thus ownership had not changed under section 60, in that they enjoyed beneficial use of the real property before the dissolution of the partnership due to their status as partners. (35 Cal.App.4th at p. 1110.)

[21] Indeed, the FVM LLC Agreement provides that in the event of a major dispute on management items on which both members must agree—including selling or encumbering the Mall—the dispute is to be resolved through a sale of one party's membership interest to the other, not a sale of the real property.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and McIntyre, J., concurred.