Filed 6/29/17

# IN THE SUPREME COURT OF CALIFORNIA

926 NORTH ARDMORE AVENUE, LLC, )
                                             )
          Plaintiff and Appellant,     )
                                             )               S222329
          v.                           )
                                             )      Ct.App. 2/7 B248356
COUNTY OF LOS ANGELES,       )
                                             )     Los Angeles County
          Defendant and Respondent.    )   Super. Ct. No. BC476670
_____)

Here we consider whether the County of Los Angeles can impose a documentary transfer tax on a written instrument that transfers beneficial ownership of real property from one person to two others. We hold that the tax may be imposed if the document reflects a sale: that is, an actual transfer of legal beneficial ownership made for consideration.

## I. FACTS AND PROCEDURE

### A. *Transactions Involving the Building*

This case arises from a series of transactions among trusts maintained for the benefit of Averbook family members. Beryl and Gloria Averbook owned an apartment building at 926 North Ardmore Avenue in Los Angeles (the Building). In 1972, they established a family trust and transferred the Building into it. Beryl died in 2007. After his death, the family trust's assets, including the Building, were transferred to an administrative trust maintained for Gloria's benefit. Bruce and Allen Averbook, Gloria's sons, were named successor trustees.

SEE DISSENTING OPINION

In their roles as successor trustees, Bruce and Allen formed two entities: 926 North Ardmore Avenue, LLC (LLC), a single-member limited liability company established to acquire and hold the Building; and BA Realty, LLLP (BA Realty), a partnership. The administrative trust was the sole member of LLC. It also held a 99 percent partnership interest in BA Realty.[1]

Between August and December 2008, the administrative trust engaged in the following transactions. First, it conveyed the Building by grant deed to LLC. Second, it transferred its membership interest in LLC to BA Realty. Third, it divided its 99 percent interest in BA Realty and distributed it to four subtrusts also maintained for Gloria's benefit. The survivor's trust received 64.66 percent; the nonexempt marital trust 23.86 percent; the exempt marital trust 0.67 percent; and the bypass trust 9.81 percent.

The net result of these transactions did not alter one central reality. When Beryl and Gloria transferred the Building from themselves personally into the family trust, they retained a beneficial interest. The trust became the legal owner, but it was obligated to hold and manage the Building for their benefit. After Beryl's death, Gloria held the sole beneficial interest. The subsequent transactions described in the preceding paragraph moved the Building's legal ownership among the various entities. But Gloria's beneficial interest remained unchanged.

In January 2009, a different kind of transaction triggered imposition of the documentary transfer tax. The survivor's trust, the nonexempt marital trust, and the marital trust transferred all of their interests in BA Realty to two trusts maintained for Allen and Bruce. Allen and Bruce were each the sole beneficiary

---

[1] BA Realty's general partner, BA Realty Management, LLC (BARM), held the other 1 percent partnership interest in BA Realty. BARM, in turn, was wholly owned by the administrative trust.

of their named trust.  (These trusts will be referred to as the Allen and Bruce Trusts.)  As a result, Allen and Bruce each acquired a beneficial interest in the Building they had not held before.

The 2009 transfers were effectuated by written instruments, including six limited partner transfer and substitution agreements.  The transaction did not involve the execution of a deed or other instrument transferring title to the Building.  The agreements did not mention the Building or its location, nor were they recorded.  After the transfers, the Allen and Bruce Trusts each held a 44.595 percent partnership interest in BA Realty, which was the sole member of LLC.[2]  LLC, in turn, held legal title to the Building.  In consideration for the transferred interests, the Allen and Bruce Trusts executed promissory notes to Gloria's three subtrusts.  The amount paid by the Allen and Bruce Trusts was based on an appraisal of the assets of BA Realty, including the Building.

B.   *Change in Ownership and Property Tax Assessment*

As required by Revenue and Taxation Code[3] section 480.2, subdivision (a), LLC filed a statement with the state Board of Equalization describing these transfers.[4]  Based on that statement, the Los Angeles County Assessor (Assessor) determined the January 2009 transfers of BA Realty resulted in a change in ownership of the Building under section 64, subdivision (d).  The Assessor issued a supplemental property tax assessment to LLC.  This assessment was paid and is

---

[2]   The remaining 10.81 percent of BA Realty continued to be owned by the bypass trust (9.81 percent) and BARM (1 percent).

[3]   All unspecified statutory references are to the Revenue and Taxation Code.

[4]   When there is a change in control of a legal entity under section 64, subdivision (c) or (d), the person or entity acquiring control, or the legal entity itself, must file a statement with the Board of Equalization listing all counties in which the legal entity owns real property.  (§§ 480.1, subd. (a), 480.2, subd. (a).)

3

not disputed here. Whether a change in ownership occurred, however, is integral to the determination whether the documentary transfer tax applies.

Under California's property tax laws, a "change in ownership" of real property occurs when there is "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (§ 60.) Section 60 plays a central role in the state's property tax scheme: A change in ownership triggers reappraisal and reassessment for property tax purposes. (Cal. Const., art. XIII A, § 2; 1 Ehrman & Flavin, Taxing Cal. Property (4th ed. 2008) Proposition 13, § 2.6, p. 2-20.)

Generally, the transfer of an interest in a *legal entity* does not result in a change in ownership of the entity's real property. (§ 64, subd. (a); see also 1 Ehrman & Flavin, *supra*, § 2.15, p. 2-40.) This rule has two major exceptions.[5] Relevant here, there is a change in ownership of all real property owned by a legal entity when (1) the property was previously transferred to that entity, but that transfer was deemed not to be a change in ownership under section 62, subdivision (a),[6] and (2) shares or interests representing more than 50 percent of the total interests in the entity are subsequently "transferred by any of the original coowners in one or more transactions." (§ 64, subd. (d).)

---

[5] Under the first exception, which is not at issue here, there is a change in ownership of all real property owned by legal entity "ABC" when another legal entity, "XYZ," obtains control of a majority of the voting stock of ABC, if ABC is a corporation, or a majority interest in ABC, if ABC is a partnership, limited liability company, or other legal entity. (§ 64, subd. (c).)

[6] Section 62, subdivision (a), excludes from the definition of change in ownership any transfer between coowners of real property, or between an individual or individuals and a legal entity, or between legal entities, that results in a change in the method of holding title to the property without changing the proportional interests of the coowners, or of the transferors and transferees, in the real property. (See § 62, subd. (a)(1), (2).)

That is what happened here.  The transfer of *the Building*, in August 2008, from the administrative trust to LLC, was not a change in ownership under section 62, subdivision (a), because it resulted in a change in the method of holding title without changing the beneficial ownership of the Building.  The transfer of *LLC*, in August 2008, from the administrative trust to BA Realty, was not a change in ownership under section 64, subdivision (a), because Gloria remained the beneficial owner of the Building.  The transfer of *interests in BA Realty*, in December 2008, from the administrative trust to Gloria's four subtrusts, was not a change in ownership under section 64, subdivision (a), because Gloria still remained the Building's beneficial owner.  But the transfer of *interests in BA Realty*, in January 2009, from Gloria's subtrusts to the Allen and Bruce Trusts, *was* a change in ownership under section 64, subdivision (d), because (1) there had been a previous transfer deemed not to be a change in ownership under section 62, subdivision (a), and (2) a majority interest in BA Realty was subsequently transferred by Gloria's subtrusts to the Allen and Bruce Trusts.

*C.  Documentary Transfer Tax Assessment and Refund Claim*

In August 2011, LLC received a notice from the Los Angeles County registrar-recorder (Recorder) demanding payment of the county's documentary transfer tax.  This tax is different from the property tax assessment.

The Recorder explained the transfer tax was due because the Building had undergone a change in ownership.  LLC paid the amount demanded and filed a claim for refund.  LLC argued the documentary transfer tax is a levy on written instruments that transfer ownership of real property, not on written instruments

5

that transfer legal entity interests.**7**  In the alternative, LLC argued no tax was due because (1) BA Realty, the entity transferred, did not hold legal title to the Building; (2) LLC, which held legal title to the Building, was not transferred; and (3) legal title to the Building did not change.  The county denied the refund claim.

When LLC then filed this refund action, the trial court denied the claim. LLC appealed, and the Court of Appeal affirmed, holding a county may impose its documentary transfer tax whenever a transfer of legal entity interests results in a change in ownership under section 64, subdivision (c) or (d).  Based on its finding the Building had changed ownership under section 64, subdivision (d), the Court of Appeal held the county was permitted to impose its documentary transfer tax.

## II.   DISCUSSION

The issue is whether the county was authorized, under section 11911, to tax written instruments that transferred interests in BA Realty from Gloria's subtrusts to the Allen and Bruce Trusts.  This question is one of statutory interpretation.

Accordingly, our primary task is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.)  The Legislature's language is the best indicator of its intent. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826.)  The words of the statute "must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must, to the extent possible, be harmonized." (*Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 746.)  If the statutory language is not clear, a court may resort to extrinsic sources, like legislative history. (*Hess v. Ford Motor Co.* (2002) 27

---

**7**      LLC also argued that, even if the transfer of a legal entity could trigger imposition of the tax, the transfer of interests in BA Realty was exempt under section 11925.  It conceded during trial that this exemption did not apply.

6

Cal.4th 516, 531.)  As to tax statutes, courts "may not extend their provisions, by implication, beyond the clear import of the language used," and a statute whose language is unclear should be construed to favor the taxpayer.  (*Edison California Stores v. McColgan* (1947) 30 Cal.2d 472, 476.)  That said, though taxpayers "may adopt any lawful means for the lessening of the burden of taxes . . . upon properties or profits," the Legislature may enact measures to prevent avoidance of taxes properly imposed.  (*Ibid*.)

In a tax refund action, the burden of proof is on the taxpayer, who must demonstrate the assessment is incorrect and produce evidence to establish the proper amount of the tax.  (*Dicon Fiberoptics, Inc. v. Franchise Tax Bd*. (2012) 53 Cal.4th 1227, 1235.)  Here, LLC does not claim it owes a different amount of tax.  Instead, it challenges the county's authority to tax this transaction at all.

A.  *The Scope of the Documentary Transfer Tax*

Section 11911 is part of the Documentary Transfer Tax Act (the Transfer Tax Act) (§ 11901 et seq., added by Stats. 1967, ch. 1332, § 1, p. 3162.).  That section permits the county to levy a tax "on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers," if "the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale)" exceeds $100.  (§ 11911, subd. (a).)  This means that when realty is sold for a net price of more than $100 the document effecting that sale is subject to taxation.

Section 11911 is derived from a provision of the former federal documentary stamp act (the stamp act) (26 U.S.C. former § 4301 et seq. (1964), repealed by Pub.L. 89-44, tit. VIII, § 802(a)(2) (June 21, 1965) 79 Stat. 159).  The

7

stamp act also imposed a tax on written instruments conveying "lands, tenements, or other realty sold" in return for consideration. (26 U.S.C. former § 4361 (1964).)[8] The county's tax provision employs substantively identical language, with slightly different punctuation. (See L.A. County Code, § 4.60.020.)

LLC argues the tax authorized by section 11911 cannot be imposed on a written instrument that transfers an interest in a legal entity, even if the entity owns real property, unless the instrument refers to or shows the location of the realty. According to LLC, the plain language of section 11911 restricts its scope to instruments that directly reference real property. An instrument that merely transfers an interest in a legal entity does not grant, assign, transfer, or convey "lands, tenements, or other realty sold" within the meaning of the statute. Unless the subject matter of the instrument is real property, the instrument is not taxable. For support, LLC points to the legislative history of the Transfer Tax Act, in particular the Legislature's decision *not* to enact a provision comparable to the stamp act's corporate stock transfer tax.[9] It argues that decision reveals a legislative intent *not* to tax transfers of legal entity interests. Based on this construction, LLC contends the documents here are not taxable because they transferred interests in BA Realty and did not refer to the Building or its location.

---

[8] The Legislature's understanding was that the Transfer Tax Act would be implemented in accordance with federal authorities implementing the Stamp Act. (Enrolled Bill Mem. on Sen. Bill No. 837 (1967 Reg. Sess.) Aug. 18, 1967, p. 1 [noting the bill was "designed to conform to the existing federal tax on transfers of real property"]; Ops. Cal. Leg. Counsel, No. 25569 (Aug. 4, 1967) on Sen. Bill No. 837 (1967 Reg. Sess.), printed at 3 Sen. J. (1967 Reg. Sess.) pp. 4738-4739 [stating the bill's provisions were "quite similar" to those of the stamp act and would likely "be construed in the same manner as the federal law"].)

[9] In addition to the real property transfer tax, the federal stamp act imposed a tax on corporate stock transfers (26 U.S.C. former § 4321 (1964)). The Transfer Tax Act does not authorize a tax on corporate stock transfers.

8

Relying on sections 11911.1, 11932, and 11933, LLC and amici curiae further argue that the scope of the documentary transfer tax is limited to recorded documents. Section 11911.1 provides that a county may require that any document subject to the tax include the tax roll parcel number of the property conveyed. (§ 11911.1.) Section 11932 requires that every document subject to the tax and submitted for recording show the location of the lands, tenements, or other realty described in the document. (§ 11932.) Section 11933 prohibits the recording of any document subject to the tax unless the tax has been paid. (§ 11933.) LLC and amici curiae argue that these provisions demonstrate the tax does not apply to a written instrument conveying legal entity interests because, typically, that type of instrument would not show the property's parcel number or location, and would not be recorded. In addition, they argue the tax cannot be imposed on unrecorded documents because the Transfer Tax Act provides no mechanism for tax collection when a written instrument is not recorded.

We begin with the text of section 11911, but find it provides no clear answers. Considered in isolation, it is possible to read section 11911 as LLC suggests: authorizing a tax only on documents that directly reference and transfer real property. However, it is also possible to read section 11911 as the county suggests: authorizing a tax on any instrument by which an interest in real property is sold, whether directly by a deed, or indirectly, as part of a transaction involving the transfer of a legal entity. The Transfer Tax Act provides no definitions for any of section 11911's important terms and phrases. The provision employs multiple, overlapping terms to describe each of its key elements. The legislative language is not so plain as to embrace one construction over the other.

This ambiguity is eliminated, however, if we consider section 11911 in context. The fundamental premise underlying LLC's construction is that, for purposes of the Transfer Tax Act, a transaction is either a taxable conveyance of

9

real property or a nontaxable transfer of legal entity interests.  That premise is undermined by section 11925, which provides that, "[i]n the case of any realty held by a partnership or other entity treated as a partnership for federal income tax purposes," the tax shall not be imposed "by reason of any transfer of an interest" in the entity if the entity is considered a continuing partnership under 26 United States Code section 708 and continues to hold the realty.[10]  (Rev. & Tax. Code, § 11925, subd. (a).)  If the entity terminates, however, it will be treated as if it executed an instrument conveying any realty it held at the time of termination, and that constructive instrument is taxable.  (§ 11925, subd. (b).)  The county's ordinance includes this exemption.  (See L.A. County Code, § 4.60.080.)

The federal stamp act had a similar exemption.  Neither the federal real property conveyance tax nor the federal corporate stock transfer tax would be imposed by reason of any transfer of an interest in a partnership, if the partnership did not terminate and continued to hold the realty or stock.  (26 U.S.C. former § 4383(a) (1964).)  If the partnership terminated, it would be treated as if it transferred all of its shares and executed a document transferring all of its realty.  (26 U.S.C. former § 4383(b)(1) (1964).)  The existence of this exemption shows that the stamp act's real property conveyance tax could have been triggered by the transfer of interests in a legal entity.  If a legal entity transfer could not have triggered that tax, it would have been unnecessary to exempt transfers of nonterminating partnerships from its scope.[11]

---

[10]     Under 26 United States Code section 708, a partnership terminates if "within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."  (26 U.S.C. § 708(b)(1)(B).)  If an existing partnership is not terminated, it is "continuing."  (26 U.S.C. § 708(a).)

[11]     LLC contends there is no authority suggesting the stamp act's real property conveyance tax ever applied to transfers of legal entity interests.  As noted, the

*(footnote continued on next page)*

10

The federal stamp act's treatment was carried forward by section 11925. It creates a conditional exemption from the documentary transfer tax for realty held by specified entities when interests in those entities are transferred. Its inclusion in the Transfer Tax Act indicates the underlying scheme is one in which the transfer of an interest in a legal entity might otherwise result in a tax liability. If the Legislature did not intend the tax to apply to any transaction involving the transfer of legal entity interests, section 11925 would serve no purpose. No transfer of an interest would create liability, so no exemption would be needed.

Section 11925 shows that the Legislature considered it necessary to clarify the circumstances in which a transfer of an interest in a legal entity would result in application of the tax. The Legislature's enactment of this clarification demonstrates that the transfer of an interest in a legal entity that owns real property can potentially trigger imposition of the tax.[12]

---

*(footnote continued from previous page)*

stamp act imposed a tax on corporate stock transfers. (See *ante*, at p. 8, fn. 9.) This likely explains the lack of authority for imposing the federal real property transfer tax on indirect transfers of real property resulting from transfers of corporate stock. If the underlying transfer of real property were taxed in addition to the corporate stock transfer, the value of the property transferred would have been taxed twice. Indeed, when a partnership terminated, the stamp act provided that "not more than one tax shall be imposed under section 4321 . . . , or 4361, as the case may be, by reason of such termination (and any transfer pursuant thereto) with respect to the shares, certificates, rights, or realty held by such partnership at the time of such termination." (26 U.S.C. former § 4383(b)(2) (1964).) In other words, if a partnership owned a corporation that owned real property, and the partnership terminated, only one of the two taxes could be imposed on the resulting transfer of the corporation's real property. The prohibition of *double* taxation of the value of real property transferred in these situations suggests the potential scope of the federal tax was not as limited as LLC contends.

[12] We reject LLC's argument that the purpose of section 11925 is to identify the one instance in which the transfer of a legal entity triggers imposition of the

*(footnote continued on next page)*

11

Sections 11911.1, 11932, and 11933 do not alter this analysis. It is settled that "recordation of a deed [is not] the touchstone of taxability for documentary stamp purposes." (*Raccoon Development, Inc. v. U.S.* (Ct.Cl. 1968) 391 F.2d 610, 613.)[13] More importantly, none of the cited provisions limits the scope of the tax. That a document subject to the tax may not be recorded unless the tax has been paid does not mean that only documents submitted for recording are subject to the tax. Section 11933 simply provides a mechanism for tax collection when a document is submitted for recording. Similarly, section 11932's requirement that every document submitted for recording show the location of the realty does not mean that only documents showing the location of realty are subject to the tax. That section imposes a requirement for documents submitted for recording. For those not submitted for recording, like the documents at issue here, the requirement does not apply. Finally, the fact a county may require any document subject to the tax to include the tax roll parcel number does not mean that only

---

*(footnote continued from previous page)*

tax. If that were the Legislature's intent, it would have taxed real estate transfers resulting from the termination of partnerships. It would not have created an exemption for nonterminating partnerships and entities (§ 11925, subd. (a)), and then an exception to that exemption for terminating partnerships and entities (§ 11925, subd. (b)), to single out the one type of taxable transfer.

[13]     In *City of Cathedral City v. County of Riverside* (1985) 163 Cal.App.3d 960, the Court of Appeal commented that the "documentary transfer tax is the fee paid in connection with the recordation of deeds or other documents evidencing transfers of ownership of real property." (*Id.* at p. 962.) That statement was dictum, and it does not accurately describe the tax. The documentary transfer tax is an excise tax on the privilege of conveying real property by means of a written instrument. (See *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 145.) We disapprove the court's dictum in *City of Cathedral City v. County of Riverside*, *supra*, 163 Cal.App.3d at page 962.

12

documents showing that number are subject to the tax. That construction would be absurd, as it would permit parties to evade imposition of the tax by omitting that number from an otherwise taxable document.

Thus, we conclude a written instrument conveying an interest in a legal entity that owns real property may be taxable, even if the instrument does not directly reference the real property and is not recorded.[14]

### B. The Propriety of the County's Assessment

In assessing the transfer tax against LLC, the Recorder relied on the Assessor's determination the Building had changed ownership for property tax purposes. A Recorder's office employee testified that this practice began in 2010. Before 2010, the Recorder routinely collected the transfer tax on deeds and other instruments submitted for recording, but generally did not collect the tax on

---

[14] The dissent suggests this result expands the transfer tax (see dis. opn. of Kruger, J., *post*, at pp. 2, 12), asserting that previously the tax and its federal counterpart have only applied to "documents, such as deeds and title instruments, that directly convey interests in real property for consideration" (*id*. at p. 4). The record demonstrates otherwise. At trial, a Recorder's office employee testified that taxpayers have been voluntarily remitting transfer taxes for unrecorded transfers of real property, like the one here, since she began working there in 2002. That is, while some taxpayers, like LLC, have taken the position that no transfer tax is due on the transfer of a legal entity interest, others have taken the opposite position and paid the tax. Thus, the tax has applied more broadly, based on self-reporting by taxpayers, than the dissent suggests. Moreover, legal commentaries on the topic show that the question whether the transfer tax applies to indirect transfers of real property has been the focus of an ongoing debate. (Cruz & Rogers, *A Practical Guide to Transfer Taxes in California* (Spring 2005) 23 Cal. Real Property J. 13, 14 ["[c]ontrary to popular misconception, transfer tax is due and payable on transfers irrespective of whether the transfer instrument is submitted for recording"; "[t]ransfer tax may even be payable in the case of transfer of partnership or other equity interests"]; see also Cruz, *2015 Update: Transfer Taxes in California* (2015) 33 Cal. Real Property J. 5, 9; compare with Obico, *Taxation of the Transfer of Single Member LLCs That Own Real Estate* (June 2012) 35 L.A. Law. 11, 12.)

13

unrecorded real property transfers unless a taxpayer voluntarily reported and paid the tax. (See *ante*, p. 13, fn. 14.) The reason for this, according to the employee, was that the Recorder did not have access to the information contained in the change in ownership statements filed with the Board of Equalization.[15] (See *ante*, at p. 3, fn. 4.) In 2009, the Legislature amended section 408, subdivision (b), to require county assessors to disclose that information to county recorders conducting investigations into whether the transfer tax may be imposed. (§ 408, subd. (b), as amended by Stats. 2009, ch. 622, § 1, p. 5117.) Thereafter, the Recorder began routinely assessing the transfer tax whenever a change in control of a legal entity resulted in a change in ownership of real property.

LLC argues the Recorder's reliance on property tax rules was misplaced. It urges the Legislature cannot have intended the change in ownership rules to apply in implementing the Transfer Tax Act because those rules were enacted more than a decade later and are found in a different division of the Revenue and Taxation Code. Instead, the county should have relied on federal authorities construing the stamp act, none of which held the federal tax could be triggered by the transfer of a legal entity. Rather, they stood for the proposition the tax only applied to written instruments directly referencing and transferring real property.

LLC is correct that the Legislature's intent, in enacting the Transfer Tax Act, was "to perpetuate the federal administrative interpretations" of the stamp act. (*Thrifty Corp. v. County of Los Angeles* (1989) 210 Cal.App.3d 881, 884

---

[15] The Board of Equalization is required to share that information with county assessors, so that each assessor can determine whether property within its jurisdiction has changed ownership. (§§ 480.1, subd. (e), 480.2, subd. (e).) But before 2010, the information provided in those statements was required to be held confidential by the Board of Equalization and assessors. (§ 481.)

(*Thrifty*).)  Thus, if the Transfer Tax Act provides no guidance whether a specific transaction is taxable, counties should look to federal authorities construing the stamp act to make that determination.  (See, e.g., *People ex rel. Dept. Pub. Wks. v. County of Santa Clara* (1969) 275 Cal.App.2d 372, 374, fn. 3.)  Such an approach was taken by the Court of Appeal in *Thrifty*.  There, the question was whether a lease agreement was taxable under section 11911.  (*Thrifty*, at p. 883.)  The plaintiff had leased property for 20 years with an option for a 10-year renewal.  The county imposed its documentary transfer tax on the lease.  (*Ibid*.)

The trial court entered judgment against the county and the Court of Appeal affirmed.  While there was no federal authority directly on point, the *Thrifty* court noted that a lease was subject to the federal tax if it conveyed a bundle of rights approximating the rights associated with a fee simple interest.  (*Thrifty*, *supra*, 210 Cal.App.3d at pp. 884-885.)  The court thus reasoned that the critical question was whether, under state law, the lease term was sufficiently long to "approximate an ' "ownership" ' right rather than a mere 'temporary right of possession.' " (*Id*. at p. 885.)  To make that determination, the court looked to California's property tax laws, specifically, section 61, subdivision (c)(1), which provides that the " 'creation of a leasehold interest in taxable real property for a term of 35 years or more (including renewal options)' " is a change in ownership.  (*Thrifty*, at p. 885.)  The court reasoned that, although the Transfer Tax Act did not define "realty sold," the phrase used in section 11911, "that phrase is sufficiently similar to the phrase 'change in ownership' " to give each phrase the same meaning.  (*Thrifty*, at p. 886.)  Based on that construction, the court held that the lease was not subject to

the transfer tax. Because the total lease term was for less than 35 years, the leased property had not undergone a change in ownership. (*Id*. at pp. 885-886.)[16]

We adopt a similar approach here. The parties have not cited, and our research has not revealed, any federal authority addressing the stamp act's application to a transaction exactly like this one. That is understandable. When the stamp act was in effect, limited liability companies did not exist and tax laws created disincentives for small businesses to take the corporate form. (Hamill, *The Origins Behind the Limited Liability Company* (1998) 59 Ohio St. L.J. 1459, 1460, 1509-1511.) There are federal authorities that can assist our analysis, however.

LLC particularly relies on *United States v. Seattle Bank* (1944) 321 U.S. 583 (*Seattle Bank*). There, the Court considered whether the federal tax applied to the transfer of real property resulting from a statutory consolidation of a national bank and a state bank. (*Id*. at p. 585.) The consolidation agreement provided that all of the state bank's assets, including its real estate, would " 'pass to and vest in the consolidated association.' " (*Ibid*.) That transfer, however, "was not evidenced by any deed, conveyance, assignment or other instrument." (*Ibid*.)

The transfer was held not taxable. (*Seattle Bank*, *supra*, 321 U.S. at pp. 589-590.) The Court reasoned: "It is clear . . . from § 3 of the National Banking Act that the state bank's realty was not conveyed to or vested in respondent by means of any deed, instrument or writing. There was a complete absence of any of the formal instruments or writings upon which the stamp tax is laid. Nor can the realty be said to have been 'sold' or vested in a 'purchaser or purchasers'

---

[16] Similarly, in *McDonald's Corp. v. Board of Supervisors* (1998) 63 Cal.App.4th 612, the First District Court of Appeal relied on section 61, subdivision (c)(1), to determine whether a lease was subject to the documentary transfer tax. (*McDonald's*, at pp. 615-617.)

within the ordinary meanings of those terms. Only by straining the realities of the statutory consolidation process can [the consolidated association] be said to have 'bought' or 'purchased' the real property." (*Id*. at p. 590.)

Relying on *Seattle Bank*, LLC contends the federal tax applied only if there were formal instruments directly referencing the real property transferred. But the Supreme Court did not stop after noting the absence of such documents; instead, it held no tax was due because the substance of the transfer did not involve the purchase or sale of property.[17] (See also *Berry v. Kavanagh* (6th Cir. 1943) 137 F.2d 574, 576 ["[i]f Congress had intended to levy a tax on every transfer of title it could have expressed its purpose in a sentence, but it is clear from the language of the section that it intended to confine the tax to actual sales"].)

In determining whether the substance of a transaction warranted imposition of the tax, federal courts often focused on whether there was a change in beneficial ownership of the real property. For example, in *Carpenter v. White* (1st Cir. 1935) 80 F.2d 145 (*Carpenter*), two business trusts, the Amoskeag Company and the Parkhill Manufacturing Company, transferred real property to a third business trust, the Amoskeag Manufacturing Company. (*Carpenter*, at p. 146.) In return, the Amoskeag Manufacturing Company issued shares to the two business trusts, each of which distributed the shares to its shareholders. (*Ibid*.) The Commissioner of Internal Revenue assessed the federal stamp tax on the full value

---

[17]   This reading of *Seattle Bank* is bolstered by Internal Revenue Service, Revenue Ruling 57-580, 1957-2 C.B. 768. There, the IRS considered whether the federal stamp tax applied to transactions involved in a state and national bank merger. It concluded that, even if "title to any real estate is conveyed by the state bank to the association, no documentary stamp tax will be incurred on the delivery of the deed or deeds, since the realty in this type of transaction is not considered to have been sold" under the stamp act. (IRS, Revenue Ruling 57-580, p. 770.)

of the real property conveyed. (*Ibid*.) The Amoskeag Company argued no tax was due because there had been no sale of a beneficial interest in real property; rather, only legal title to the property had been conveyed. (*Ibid*.)

The First Circuit Court of Appeals upheld the imposition of the tax. The court acknowledged "that mere rearrangement of the title to property . . . , without real change of ownership, is not a taxable conveyance." (*Carpenter*, *supra*, 80 F.2d at p. 146.) But it found this transaction was not a mere rearrangement of title. (*Ibid*.) Instead, there was "a complete change in both the legal title and the beneficial ownership of the property, not a continuance of the same beneficial ownership in the hands of new trustees." (*Ibid*.) Moreover, the court found that "the equitable interests of the new shares" were not "in the same property as those of the old shares; the latter represented interests only in the property of the Amoskeag Company; the former, interests in all the property conveyed to the new trust." (*Ibid*.) Based on those findings, the court concluded the federal stamp tax applied to the transfer. (*Id*. at p. 147.)

Under *Carpenter*, it is clear that if a transaction resulted in the transfer of beneficial ownership of real property for consideration it was subject to the federal real property transfer tax. When a transaction did not result in the transfer of beneficial ownership, however, the federal authorities were less clear. In *Socony-Vacuum Oil Co. v. Sheehan* (E.D.Mo. 1943) 50 F.Supp. 1010, *R.H. Macy & Co. v. U.S.* (S.D.N.Y. 1952) 107 F.Supp. 883, and *Greyhound Corp. v. U.S.* (7th Cir. 1954) 208 F.2d 858, the federal courts confronted cases in which parent companies dissolved their wholly owned subsidiaries and the subsidiaries transferred real property to the parent companies. (*Socony*, at p. 1011; *R.H. Macy*, at pp. 883-884; *Greyhound*, at p. 859.) Though none of the real property transfers resulted in a change in beneficial ownership, the cases reached different results. In *Socony*, the court held no tax was due because the parent, "as the owner of all the

18

capital stock of the . . . subsidiary corporations . . ., was the equitable owner of all the real estate and other assets of each of [the] subsidiaries before the deeds in question were given." (*Socony*, at p. 1012.) The deeds were given "to show the transfer of legal title only." (*Ibid.*; see also *U.S. v. Niagara Hudson Power Corporation* (S.D. N.Y. 1944) 53 F.Supp. 796, 801 ["a mere transfer or change of legal title is not a taxable transaction"].) In *R.H. Macy* and *Greyhound*, on the other hand, the courts held the federal tax did apply to the extent the parent assumed its subsidiaries' liabilities in the transaction. (*R.H. Macy*, at p. 885; *Greyhound*, at p. 860.)

As to this second category of transactions, in which beneficial ownership is not transferred, the California Legislature has provided clarity where the federal case law did not. In 1999, the Legislature added subdivision (d) to section 11925, exempting from the documentary transfer tax any conveyance of realty "between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title to the realty and in which proportional ownership interests in the realty, whether represented by stock, membership interest, partnership interest, . . . or otherwise, . . . remain the same immediately after the transfer." (§ 11925, subd. (d).)[18]

Combining all of these principles, we conclude that the critical factor in determining whether the documentary transfer tax may be imposed is whether there was a sale that resulted in a transfer of beneficial ownership of real property. The change in ownership rules, though enacted after the Transfer Tax Act, fit squarely into this framework. The federal stamp tax applied to written instruments

---

[18]     The scope of this exemption is similar to that of the change in ownership exclusion set forth in section 62, subdivision (a). (See *ante*, at p. 4, fn. 6.)

that transferred a " 'bundle of rights' " approximating an estate in fee simple. (See *Texaco, Inc. v. U.S.* (5th Cir. 1980) 624 F.2d 20, 21.) The triggering event for reappraisal under California's property tax laws is a "transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (§ 60.) The change in ownership provisions, including section 64, subdivisions (c) and (d), provide rules for distinguishing " 'true' changes in ownership" from " 'paper' ones," and they identify a subset of beneficial interest transfers that are significant enough to approximate new ownership, and thus to warrant property reappraisal. (*Sav-On Drugs, Inc. v. County of Orange* (1987) 190 Cal.App.3d 1611, 1617-1618; see also *id*. at pp. 1617-1618 [property tax "reassessments may not be avoided . . . via the simple expedient of disguising transfers of realty by means of selling all or a majority of the stock in real estate holding companies"].) Put another way, the change in ownership rules are designed to identify precisely the types of indirect real property transfers that the Transfer Tax Act is designed to tax.[19]

Thus, we agree with the Court of Appeal's conclusion. Section 11911 permits the imposition of a documentary transfer tax whenever a transfer of an interest in a legal entity results in a change in ownership of real property within the meaning of section 64, subdivision (c) or (d), so long as there is a written instrument reflecting a sale of the property for consideration. Here, there were written instruments reflecting the transfer of beneficial ownership of the Building, and the evidence at trial demonstrated that the Allen and Bruce Trusts paid

---

[19] There are, of course, transactions that the change in ownership rules and the Transfer Tax Act treat differently. For example, the transfer of real property for no consideration, e.g., a gift, can result in a "change in ownership" (see Cal. Code Regs., tit. 18, § 462.001), but is exempt from the transfer tax (§ 11930).

20

Gloria's subtrusts for the interests they acquired in the Building. This payment was consideration for the sale.

Under LLC's construction of the statute, if A executed a deed transferring real property to B, that deed would be taxable. But if A created a limited liability company, executed a deed transferring real property to that company, and then executed a written instrument transferring the company to B, the tax would not apply. That approach would elevate form over substance, and conflict with the purposes of the Transfer Tax Act. Subject to the qualifications set forth above and to the exemption set forth in section 11925, the documentary transfer tax may be imposed when a transfer of a legal entity results in a change in ownership of real property under section 64, subdivision (c) or (d).

## III.    DISPOSITION

The Court of Appeal correctly rejected plaintiff's refund claim. The transfer of a beneficial interest in the Building to the Allen and Bruce Trusts was a sale, accompanied by consideration and effected by a document of transfer. The judgment of the Court of Appeal is affirmed.


CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.

21

**DISSENTING OPINION BY KRUGER, J.**

The Documentary Transfer Tax Act (DTTA; Rev. & Tax. Code, § 11901 et seq.)**1** permits a county to impose a tax "on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser . . . ." (§ 11911, subd. (a).)  The question here is whether, and under what circumstances, the documentary transfer tax applies to the transfer of an interest in a legal entity. The majority holds that a transfer of such an interest is taxable if three conditions are met:  There is a written instrument evidencing the entity interest transfer; the transfer is for consideration; and the transfer results in a "change in ownership" of the entity's real estate, as that term has been defined in a later-enacted set of statutory rules governing property tax reassessments.  (§ 64, subds. (c) & (d); see maj. opn., *ante*, at p. 20.)

There is a certain amount of appeal to the notion that a transaction that counts as a property transfer for purposes of the property tax laws should also count as a property transfer for purposes of the documentary transfer tax.  But superficially appealing though the result may be, it finds no support in either the language of the DTTA — which nowhere incorporates the definitional provisions

---

**1**      All further undesignated statutory references are to the Revenue and Taxation Code.

1

of the later-promulgated property tax laws — or in the over-150-year history of the documentary transfer tax. So far as I am aware, neither the DTTA itself, nor the federal statutes on which it was modeled, has before been held to apply to run-of-the-mill transfers of interests in legal entities that happen to own real estate. And to expand the statute in this way raises unanswered questions that the Legislature could not have anticipated when it passed the act. Because, in my view, whether and how to expand the DTTA are matters for the Legislature to decide, I respectfully dissent.

## I.

Although the DTTA has been on the books in California only since 1967, documentary transfer taxes have a much longer pedigree. Congress passed a tax requiring the affixing of documentary stamps to instruments conveying "realty sold" as early as 1862. (Revenue Act of July 1, 1862, ch. 119, schedule B, 12 Stat. 481.) Congress reenacted this tax several times over the ensuing decades, along with stamp taxes on, among many other things, transfers of stocks and bonds. (See, e.g., Act of June 13, 1898, ch. 448, § 6 & schedule A, 30 Stat. 451, 458, 460; Int. Rev. Code of 1939, §§ 1082(b), 3481–3482, added by 53 Stat. 196–197, 424–425; Int. Rev. Code of 1954, §§ 4321, 4331, 4361, added by 68A Stat. 515–516, 520.) In 1965, Congress repealed the stamp tax on instruments conveying realty, as well as the taxes on transfers of stocks and bonds, as part of a larger reform of federal excise taxes. (Excise Tax Reduction Act of 1965, Pub.L. No. 89-44, § 401(a)–(b) (June 21, 1965), 79 Stat. 148.)

California picked up the mantle following the federal repeal, enacting a statute — the DTTA — that mirrored the federal stamp tax on instruments conveying realty, but did not incorporate the stamp taxes on transfers of stocks and bonds. (Stats. 1967, ch. 1332, p. 3162.) The enrolled bill memorandum reflects a legislative intent to "conform to the existing federal tax on transfers of real

2

property." (Enrolled Bill Mem. on Sen. Bill No. 837 (1967 Reg. Sess.) Aug. 18, 1967, p. 1; maj. opn., *ante*, at p. 8, fn. 8 [quoting].)  The resulting statute permits a county to "impose, on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale) exceeds one hundred dollars ($100) a tax at the rate of fifty-five cents ($0.55) for each five hundred dollars ($500) or fractional part thereof."  (§ 11911, subd. (a).)[2]

Whether, and under what circumstances, an entity interest transfer falls within the DTTA's scope is a question of statutory interpretation.  By its terms, the tax authorized by the DTTA applies to "deed[s]" or other "writing[s]" by which land or other real property is conveyed for value.  (§ 11911, subd. (a); see Black's Law Dict. (4th ed. 1957) p. 502 [defining "deed" as "[a] conveyance of realty, a writing signed by grantor, whereby title to realty is transferred from one to another"].)  Section 11911 says nothing about the taxation of entity interest transfers.  And as the majority acknowledges (maj. opn., *ante*, at p. 11, fn. 11), neither the statute itself nor the federal statute on which it was modeled has (at least until now) been held to reach such transfers.  Rather, the DTTA and its federal counterpart have been applied exactly as one might expect, given their

---

[2]      A city imposing a tax in conformity with the DTTA is entitled to share in the tax revenue.  (§ 11911, subds. (b) & (c).)  An uncodified section of the act prohibits cities and counties, except charter cities and consolidated city and county governments, from "directly or indirectly impos[ing] a tax on transfers of real property which is not in conformity with [the DTTA]."  (Stats. 1967, ch. 1332, § 2, p. 3165.)

3

language: namely, to documents, such as deeds and title instruments, that directly convey interests in real property for consideration. (See, e.g., 26 C.F.R. former § 47.4361-1 (1967) [the stamp tax applied to instruments conveying a "bundle of rights approximating" an enduring real property interest, "such as an estate in fee simple, life estate, perpetual easement, etc."].)

In finding that the DTTA encompasses entity interest transfers — unambiguously so, even — the majority relies on section 11925, subdivision (a), which provides: "In the case of any realty held by a partnership . . . no levy shall be imposed pursuant to [the DTTA] by reason of any transfer of an interest in the partnership" when the partnership "is considered a continuing partnership" (as defined in the Internal Revenue Code) and "continues to hold the realty concerned." (See maj. opn., *ante*, at pp. 9–11.) According to the majority, this exemption for continuing partnerships would be unnecessary if entity interest transfers did not trigger the documentary transfer tax as a general matter. (See *ibid.*)

Section 11925, subdivision (a) cannot bear the weight the majority places on it. For one thing, its closest neighbor — section 11925, subdivision (b) — undermines the notion that the provision is aimed at anything other than deeds and other similar documents by which real property is sold. Subdivision (b) provides: "If there is a termination of any partnership . . . the partnership . . . shall be treated as having executed an instrument whereby there was conveyed, for fair market value . . . , all realty held by the partnership . . . at the time of the termination." (§ 11925, subd. (b).) This provision is the only provision of the statute that speaks directly to the application of the documentary transfer tax because of an entity interest transfer, and it operates not by taxing the transfer directly (or by taxing a document effecting the transfer), but by deeming there to be an "instrument whereby . . . all realty held by the partnership" is conveyed for consideration.

4

(*Ibid.*)  This tends to reinforce the conclusion that the object of the DTTA is, indeed, an instrument by which realty, rather than an entity interest, is conveyed.

In any event, it is not true that section 11925, subdivision (a) would serve no purpose if the DTTA were understood to apply only to documents directly transferring real property interests.  For example, if a partnership held land in the name of one of its partners (rather than in the name of the partnership itself), that partner transferred his or her partnership interest for cash, and the partner deeded the land to the partnership or another partner "by reason of" the transfer, subdivision (a) would exempt the deed from an otherwise applicable documentary transfer tax, assuming the other requirements were met.[3]  Other DTTA exemptions work in much this way, exempting deeds or other documents conveying real property where the conveyance is made in connection with a certain event or transaction.  (See, e.g., §§ 11924 [exempting "the making or delivery of conveyances to make effective" certain orders of the Securities and Exchange Commission], 11930 [exempting instruments given "by reason of" inter vivos gift or death].)  I see no reason why subdivision (a) could not be interpreted similarly.  Indeed, there is some evidence that the federal stamp act provision on which section 11925 is based was enacted with just this purpose in mind.  (See Sen.Rep. No. 85-2090, 2d Sess., pp. 61–64 (1958), 1958-3 C.B. 584, 644–647.)

---

[3]      At common law, a partnership could not own property in its own name; it could hold property only in the name of one or more of its partners.  (See Wright, *California Partnership Law and the Uniform Partnership Act* (1921) 9 Cal. L.Rev. 117, 138.)  Now, as when the DTTA was passed, a partnership may hold property either in its own name or in the name of one or more partners.  (See 3 Witkin, Summary of Cal. Law (7th ed. 1960) Partnership, § 18, pp. 2278–2279, citing Corp. Code, former § 15008; Corp. Code, §§ 16204, 16302.)

5

## II.

To acknowledge that the DTTA applies only to deeds and other documents by which real property is sold is not to say that the documentary transfer tax could never be imposed because of a transfer of interests in a legal entity. As a general rule, "[f]or purposes of taxation, what matters is substance, not form." (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 760.) But the majority adopts a rule that reaches well beyond this substance over form principle, concluding that the DTTA applies to a document by which entity interests are transferred, for consideration, if the transaction results in a transfer of beneficial ownership of real property. The effect of the rule is to sweep into the DTTA's compass a considerable swath of entity interest transfers that bear little or no resemblance to ordinary sales of real property.[4]

---

[4]    The majority points to evidence in the record noting that some "taxpayers have been voluntarily remitting transfer taxes for unrecorded transfers of real property . . . ." (Maj. opn., *ante*, at p. 13, fn. 14.) But it is not obvious how the "voluntary" choices of certain taxpayers to pay transfer taxes is relevant to the matter before us, which concerns a taxpayer's decidedly involuntary payment of tax on an entity interest transfer that bears little resemblance to an ordinary sale of real property.

Citing various secondary sources, the majority also notes that "the question whether the transfer tax applies to indirect transfers of real property has been the focus of an ongoing debate." (Maj. opn., *ante*, at p. 13, fn. 14.) But the cited sources merely describe the recent practice by some counties — including the County of Los Angeles — of assessing tax on entity interest transfers, and discuss recent case law permitting that practice — including, primarily, the decision of the Court of Appeal in this very case. (See Cruz & Rogers, *A Practical Guide to Transfer Taxes in California* (Spring 2005) 23 Cal. Real Property J. 13, 14; Cruz, *2015 Update: Transfer Taxes in California* (2015) 33 Cal. Real Property J. 5, 9; see also Obico, *Taxation of the Transfer of Single Member LLCs That Own Real Estate* (June 2012) 35 L.A. Law. 11, 12 [taking the position that the Los Angeles County Recorder lacked authority to impose tax upon the transfer of a controlling interest in a single-member limited liability company].) Ultimately, the sources do no more than describe the terms of the very "debate" between the parties we are

*(footnote continued on next page)*

6

The majority reaches this conclusion in two steps: It first relies on federal authorities to "conclude that the critical factor in determining whether the documentary transfer tax may be imposed is whether there was a sale that resulted in a transfer of beneficial ownership of real property." (Maj. opn., *ante*, at p. 19.) The majority then goes on to borrow from the property tax law's change in ownership rules, which, it contends, "are designed to identify precisely the types of indirect real property transfers that the Transfer Tax Act is designed to tax." (*Id.* at p. 20.) Both steps of this analysis are flawed.

The majority's analysis begins by reviewing a number of federal cases applying the federal stamp act in the context of corporate transactions. The lesson the majority draws from this review is that "courts often focused on whether there was a change in beneficial ownership of the real property." (Maj. opn., *ante*, at p. 17.) The description is technically true, but it is incomplete. The cases on which the majority relies — unlike this case — involved deeds and other similar instruments transferring title to real property. The courts in those cases determined whether the deed or other instrument was taxable by considering whether the transfer of title also resulted in a change in beneficial ownership of the realty. (Compare *Carpenter v. White* (1st Cir. 1935) 80 F.2d 145, 146–147 [realty deeds were subject to stamp tax] with *Berry v. Kavanagh* (6th Cir. 1943) 137 F.2d 574, 576 [deed of realty from receiver to reinsurer evidenced a transfer of policyholders' reserve, not a sale whereby the reinsurer received beneficial ownership of the realty]; *Socony-Vacuum Oil Co. v. Sheehan* (E.D.Mo. 1943) 50

_____

*(footnote continued from previous page)*

asked to resolve here; they offer no substantive support for the manner in which the majority resolves the debate.

F.Supp. 1010, 1011–1012 [deed transferring realty from subsidiary to parent on dissolution did not evidence a taxable sale]; *U.S. v. Niagara Hudson Power Corporation* (S.D.N.Y. 1944) 53 F.Supp. 796, 800–801 [certificate of consolidation effecting the transfer of realty from one subsidiary corporation to another did not evidence a taxable sale].)

The question here, however, is not whether the transfer of legal title is a taxable sale in the absence of a transfer of beneficial or equitable ownership. It is whether the transfer of beneficial or equitable ownership, standing alone, is a sale of realty even in the absence of a document transferring legal title. To the extent the federal authorities speak to this question, they point in the other direction. In *United States v. Seattle Bank* (1944) 321 U.S. 583, a state bank and a federal bank consolidated pursuant to the National Banking Act, and executed a written consolidated agreement providing that "[a]ll assets of each association at the date of consolidation shall pass to and vest in the consolidated association . . . ." (*Id.* at p. 585.) A tax collector exacted stamp taxes from the consolidated bank. (See *ibid.*; see also Int. Rev. Service, Chief Counsel's Mem. No. 22955, Regulations 71 (1932), Article 79: "Sold" Defined (1941), 1941-2 C.B. 308, 311–312 [discussing this theory].) The high court held that the consolidated bank owed no stamp taxes, including stamp taxes on instruments conveying realty. The court explained: "[T]he state bank's realty was not conveyed to or vested in respondent by means of any deed, instrument or writing. There was a complete absence of any of the formal instruments or writings upon which the stamp tax is laid. Nor can the realty be said to have been 'sold' or vested in a 'purchaser or purchasers' within the ordinary meanings of those terms. Only by straining the realities of the statutory consolidation process can respondent be said to have 'bought' or 'purchased' the real property." (*Seattle Bank*, at p. 590.) The court so concluded even though there had been a transfer of beneficial ownership of the state bank's

8

assets for consideration:  The state bank's shareholders traded their entire beneficial ownership of the state bank's assets for partial beneficial ownership of the consolidated bank's assets.  (See *id.* at p. 585; cf. *Carpenter v. White*, *supra*, 80 F.2d at p. 146; Rev. Ruling No. 57-580, 1957-2 C.B. 768, 770 [ruling, based on *Seattle Bank*, that no stamp tax would be due on instruments conveying realty despite a 92 percent change in beneficial ownership of realty].)  All this suggests that a transfer of beneficial ownership was perhaps necessary before the federal stamp tax on documents transferring realty could be imposed, but was not a sufficient condition for the laying of the tax.

If a change in beneficial ownership of realty, by itself, were the touchstone of taxation, then, in theory, any sale of stock or other entity interest could trigger the documentary transfer tax.  The majority does not go so far, however.  The majority cabins its holding by drawing from the property tax law's change in ownership rules.  These rules generally deem entity interest transfers not "to constitute a transfer of the real property of the legal entity" (§ 64, subd. (a)), but if a person obtains control of the entity or the original owners transfer more than 50 percent of their interest in the entity, then the entity's real property is treated as though it were transferred, and must be reappraised (*id.*, subds. (c) & (d)).  According to the majority, these rules "distinguish[] ' "true" changes in ownership' from ' "paper" ones' " for property tax purposes and consequently "identify precisely the types of indirect real property transfers that the Transfer Tax Act is designed to tax."  (Maj. opn., *ante*, at p. 20.)

The majority thus construes the DTTA and the property tax law's change in ownership rules as if they operated in pari materia.  But the two statutes were enacted at different times and for different purposes.  As noted above, the Legislature enacted the DTTA in 1967, after Congress repealed the federal stamp tax on instruments conveying realty.  The Legislature enacted the change in

9

ownership rules in 1979, as part of a package of reforms giving effect to Proposition 13, a voter initiative designed to provide property tax relief. (See, e.g., *Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th 1182, 1186–1187, 1193.) These statutory schemes also relate to distinct types of taxes: Whereas the documentary transfer tax is an excise tax on the privilege of selling real property interests — and is imposed only when that right is exercised — real property taxes are imposed on the property itself, and on a recurring basis. (See *City of Huntington Beach v. Superior Court* (1978) 78 Cal.App.3d 333, 340–342 [a city's real property transfer tax did not violate the city charter's limitation on real property taxes]; *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 144–146.)

The DTTA does not purport to incorporate the later-enacted property tax laws, nor do the property tax laws purport to amend the DTTA. And differences between the two statutory schemes make clear that the rules applicable in one context cannot be imported wholesale into the other. To take one basic example, whereas the documentary transfer tax is imposed on instruments conveying "realty sold," the property tax law's change in ownership rules do not require a transfer for consideration. (Compare §§ 11911, subd. (a), 11930 with Cal. Code Regs., tit. 18, § 462.001.)

More fundamentally, to apply the property tax law's change in ownership framework in the documentary transfer tax context raises a difficult set of questions addressed nowhere in either statute. For property tax purposes, if an entity interest transfer qualifies as a change in ownership under section 64, subdivision (c) or (d), the consequence is clear: The taxable value of all of the entity's real property is reassessed, which will usually increase the annual tax paid on the property itself. The reason for these rules is also apparent: Without them, entity-owned real property could otherwise disproportionately benefit from the

10

limitations on increases in assessed value enacted as part of Proposition 13, relative to residential property, ownership of which tends to turn over more often. (See *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 95–96.)

The documentary transfer tax is, by contrast, an excise tax on the privilege of selling a real property interest, not a tax on the property itself, and is calculated on the net value of the interest conveyed. (§ 11911, subd. (a).) When entity interests are transferred, but no legal title is conveyed, it is not clear that the privilege of selling real property has been exercised. A stake in an entity — even a large one — does not necessarily entail the right to possess, use, or alienate the entity's assets. (See, e.g., Corp. Code, §§ 15907.01–15907.02, 16203, 16501–16502; *Miller v. McColgan* (1941) 17 Cal.2d 432, 436; *Bank of Visalia v. Smith* (1905) 146 Cal. 398, 403.) Is this what the Legislature had in mind when it enacted a tax on documents by which realty is sold? The statute does not say so.

Applying the property tax rules in the DTTA context also raises difficult valuation questions. One hypothetical example will suffice to illustrate the point. In the transaction at issue in this case, trusts benefiting Gloria Averbook transferred a roughly 90 percent interest in BA Realty LLLP (BA Realty) to trusts benefiting her sons, Allen and Bruce. This resulted in a change in ownership of an apartment building indirectly owned by BA Realty, and the County of Los Angeles (County), concededly correctly, reappraised the value of the building. The County also imposed a documentary transfer tax based on the entire newly assessed value of the building, not on the 90 percent economic interest that Gloria's trusts transferred nor on the amount Allen's and Bruce's trusts paid for that interest.[5] If Gloria's trusts sold their remaining interests in BA Realty to one

---

[5]    Allen's and Bruce's trusts paid for their interests in BA Realty based on a corporate valuation of BA Realty, which was based in part, but not entirely, on the

*(footnote continued on next page)*

of the son's trusts, there would be another change in ownership of the building. (See § 64, subd. (c)(1).) Under the majority's holding, another documentary transfer tax would be imposed. (See maj. opn., *ante*, at p. 20.) Should that tax be computed on the building's total value, 10 percent of the building's value, 10 percent of the price paid for the interest, or based on some other measure? Neither the DTTA nor the property tax laws provide guidance.

The Legislature could, of course, answer these questions by incorporating the property tax law's change in ownership rules into the DTTA.[6] Indeed, there has been at least one proposal to do so. (See Assem. Bill No. 561 (2013–2014 Reg. Sess.) § 1.) The Legislature could also adopt a different approach. But this court's task is to give effect to what the Legislature has already done, not to what it could do. And as it stands, the statute the Legislature has enacted does not reach as far as the majority would have it.

### III.

In the end, the majority's interpretation of the DTTA appears motivated by a concern not implicated here: "Under LLC's construction of the statute, if A executed a deed transferring real property to B, that deed would be taxable. But if A created a limited liability company, executed a deed transferring real property to

_____

*(footnote continued from previous page)*

value of BA Realty's assets. The apartment building represented about 11 percent of the total value of BA Realty's assets, which also included cash, securities, and interests in four realty-owning entities other than plaintiff.

[6] Charter cities and consolidated city and county governments could also amend their local documentary transfer tax ordinances (or the equivalent) to impose a tax when there is a change in ownership of real estate due to an entity interest transfer. (See *ante*, fn. 2; e.g., S.F. Bus. & Tax. Regs. Code, art. 12-C, § 1114, subd. (b).)

that company, and then executed a written instrument transferring the company to B, the tax would not apply.  That approach would elevate form over substance, and conflict with the purposes of the Transfer Tax Act."  (Maj. opn., *ante*, at p. 21.)  I acknowledge the concern, but existing law supplies answers.  (See, e.g., *Fashion Valley Mall, LLC v. County of San Diego* (2009) 176 Cal.App.4th 871, 880 [courts may disregard transactions that are mere "shams," lacking in economic substance].)  Here, no one doubts that the transaction at issue was bona fide, completed for legitimate reasons, and had economic substance.  To nevertheless apply the DTTA marks a significant expansion of the documentary transfer tax.

The majority's expansion of the DTTA may or may not be a good idea, but it ventures well beyond the statute's language and historical practice.  I would leave it to the Legislature to determine the circumstances under which an entity interest transfer should result in a deemed sale of the entity's real estate, and how to calculate the tax due in those circumstances.


**KRUGER, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** 926 North Ardmore Avenue, LLC v. County of Los Angeles
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 229 Cal.App.4th 1335
**Rehearing Granted**

_____

**Opinion No.** S222329
**Date Filed:** June 29, 2017
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Rita J. Miller

_____

**Counsel:**

FisherBroyles, Goodson Wachtel and Petrulis, Lemoine Skinner III; Gibson, Dunn & Crutcher, Daniel M. Kolkey, Julian W. Poon, Lauren M. Blas and Martie P. Kutscher for Plaintiff and Appellant.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong, Jeffrey M. Vesely, Kerne H.O. Matsubara for Council on State Taxation as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Peter Michaels and Peter Michaels for California Alliance of Taxpayer Advocates as Amicus Curiae on behalf of Plaintiff and Appellant.

Arent Fox, Stephen G. Larson and Steven A. Haskins for California Society of Certified Public Accountants as Amicus Curiae on behalf of Plaintiff and Appellant.

Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Christopher J. Matarese and Gregory R. Broege for Institute for Professionals in Taxation as Amicus Curiae on behalf of Plaintiff and Appellant.

Greenberg Traurig, C. Stephen Davis, Cris K. O'Neall and Andrew W. Bodeau for California Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

June Babiracki Barlow, Neil Kalin and Jenny Li for California Association of REALTORS as Amicus Curiae on behalf of Plaintiff and Appellant.

John F. Krattli, County Counsel, Mary C. Wickham, Interim County Counsel, and Albert Ramseyer, Principal Deputy County Counsel, for Defendant and Respondent.

Michael N. Feuer, City Attorney (Los Angeles), Beverly Cook, Assistant City Attorney, and Daniel, M. Whitley, Deputy City Attorney, for City of Los Angeles as Amicus Curiae on behalf of Defendant and Respondent.

Page 2 – counsel continued – S222329

**Counsel:**

Arthur J. Wylene, County Counsel (Tehama) for County of Tehama and Jennifer A. Vise, Tehama County Clerk-Recorder as Amici Curiae on behalf of Defendant and Respondent.

Donna R. Ziegler, County Counsel (Alameda) and Farand C. Kan, Deputy County Counsel, for County of Alameda as Amicus Curiae on behalf of Defendant and Respondent.

Daniel C. Cederborg, County Counsel (Fresno) and Jane T. Smith, Deputy County Counsel, for County of Fresno as Amicus Curiae on behalf of Defendant and Respondent.

Theresa A. Goldner, County Counsel (Kern) and Jerri S. Bradley, Deputy County Counsel, for County of Kern and Jon Lifquist, Kern County Assessor-Recorder as Amicus Curiae on behalf of Defendant and Respondent.

Marshall S. Rudolph, County Counsel (Mono) and John-Carl Vallejo, Deputy County Counsel, for County of Mono as Amicus Curiae on behalf of Defendant and Respondent.

Charles J. McKee, County Counsel (Monterey) and Jerrold A. Malkin, Deputy County Counsel, for County of Monterey and Stephen L. Vagnini, Monterey County Assessor-Clerk-Recorder as Amicus Curiae on behalf of Defendant and Respondent.

Matthew W. Granger, County Counsel (San Benito) and Barbara J. Thompson, Deputy County Counsel, for County of San Benito and Joe Paul Gonzalez, San Benito County Clerk, Auditor & Recorder as Amicus Curiae on behalf of Defendant and Respondent.

Gregory P. Priamos, County Counsel (Riverside) and Kristine Bell-Valdez, Deputy County Counsel, for County of Riverside and Peter Aldana, Riverside County Assessor as Amicus Curiae on behalf of Defendant and Respondent.

Michael Ghizzoni, County Counsel (Santa Barbara) and Marie A. LaSala, Deputy County Counsel, for County of Santa Barbara and Joseph E. Holland, Santa Barbara County Assessor as Amicus Curiae on behalf of Defendant and Respondent.

Brian Wirtz, County Counsel (Placer) for County of Placer and Jim McCauley, Placer County Clerk-Recorder-Registrar as Amici Curiae on behalf of Defendant and Respondent.

Thomas E. Montgomery, County Counsel (San Diego) and Walter de Lorrell III, Deputy County Counsel, for County of San Diego and Ernest J. Dronenburg, Jr., County of San Diego Assessor/Recorder/County Clerk as Amici Curiae on behalf of Defendant and Respondent.

John C. Beiers, County Counsel (San Mateo) and Rebecca M. Archer, Deputy County Counsel, for County of San Mateo as Amicus Curiae on behalf of Defendant and Respondent.

John P. Doering, County Counsel (Stanislaus) and Deirdre McGrath, Deputy County Counsel, for County of Stanislaus as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel:**

Minh C. Tran, County Counsel (Napa) and Susan Altman, Deputy County Counsel, for County of Napa and John Tuteur, Napa County Assessor-Recorder-County Clerk as Amici Curiae on behalf of Defendant and Respondent.

Bruce Goldstein, County Counsel (Sonoma) and Linda Schiltgen, Deputy County Counsel, for County of Sonoma and William F. Rousseau, Sonoma County Clerk-Recorder-Assessor as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Daniel M. Kolkey
Gibson, Dunn & Crutcher
555 Mission Street, Suite 3000
San Francisco, CA  94105-2933
(415) 393-8200

Albert Ramseyer
Principal Deputy County Counsel
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA  90012-2713
(213) 974-0809

Arthur J. Wylene
County Counsel
727 Oak Street
Red Bluff, CA  96080
(530) 527-9252